Zack **PFEIFFER**, Plaintiff,

v.

**EAGLE MANUFACTURING COMPANY**
and Dresser Industries, Inc.,
Defendants.

Civ. A. No. 89–2359–O.

United States District Court,
D. Kansas.

July 1, 1991.

As Amended Aug. 2, 1991.

Gerald L. Green, Gilliand & Hayes, P.A., Hutchinson, Kan., Brian J. Niceswanger, McDowell, Rice & Smith, Chartered, Kansas City, Mo., for Zack and Joann Pheiffer.

Bruce Keplinger, Payne & Jones, Chartered, Overland Park, Kan., for Eagle Mfg. Co.

Barry E. Warren, Wallace, Saunders, Austin, Brown & Enochs, Overland Park, Kan., for Resser Industries Inc.

Barbara J. Miller, Olathe Area SRS Office, Olathe, Kan., for State of Kan. Dept. of Social Rehabilitation Services, movant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter comes before the court on the motion of defendant Eagle Manufacturing Company (hereinafter "Eagle Manufacturing") for summary judgment. Defendant contends that its product, a gasoline can, was not defective as a matter of law because it complied with administrative regulatory safety standards in designing and manufacturing the can. Eagle Manufacturing claims it had no duty to warn plaintiff, because any danger associated with use of its product was open and obvious. Defendant also alleges that plaintiff, Zack Pfeiffer (hereinafter "Pfeiffer"), knew of the dangers associated with use of its product in light of his "extensive experience" with gasoline cans. For the reasons stated below, the court will deny Eagle Manufacturing's motion for summary judgment.

## I. STATEMENT OF FACTS

In the early evening or late afternoon of July 20, 1987, Pfeiffer was severely burned in an explosion and fire at a work site in Wyandotte County, Kansas. Immediately prior to the explosion, plaintiff had picked up a five gallon gasoline can to fuel his portable Dresser air compressor. The can was designed and manufactured by defendant Eagle Manufacturing.[1] After lifting

---

1. Defendant Eagle Manufacturing Company is a corporation organized and existing under the laws of the State of West Virginia, engaged in the business of designing and manufacturing fuel containers for distribution in the State of Kansas, among other states.

the can into position to pour gasoline into the compressor's fill tube, Pfeiffer pulled back on the can's spring-hinged handle to open its spout and release the gasoline. Plaintiff alleges that the internal pressure within the container caused gasoline to spray instantly from the can onto heated compressor components and explode, igniting Pfeiffer's flesh and clothing. The explosion seriously burned plaintiff and destroyed his compressor.

At least three million Eagle UI–50–S, Type I gasoline cans have been distributed over the course of thirty to thirty-five years. Defendant maintains that the design of these gasoline cans meets standards which were developed by Underwriters Laboratories, Inc. (hereinafter "UL") and Factory Mutual Engineering and Research Corporation (hereinafter "FM").[2] Defendant states that the can which allegedly exploded bore the approval of these two organizations.[3] Pfeiffer contends that cans produced by Eagle Manufacturing did not meet UL and FM standards. Plaintiff also points out that each individual can was not inspected, tested or approved by FM or UL. Pfeiffer had been engaged in the waterproofing business for approximately twenty-eight years. During this time, he used gasoline cans to carry fuel for his air compressors.

## II. SUMMARY JUDGMENT STANDARDS

In considering a motion for summary judgment, the court must examine all the evidence in a light most favorable to the nonmoving party. *Barber v. General Elec. Co.,* 648 F.2d 1272, 1276 n. 1 (10th Cir. 1981); *Mahomes–Vinson v. United States,* 751 F.Supp. 913, 916 (D.Kan.1990). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed. R.Civ.P. 56(c); *Maughan v. S.W. Servic-*

*ing, Inc.,* 758 F.2d 1381, 1387 (10th Cir. 1985); *see also* 6 J. Moore, *Moore's Federal Practice* ¶ 56.04 (1990) (court is authorized to examine materials outside complaint to determine whether there is genuine issue of material fact to be tried). If the moving party does not bear the burden of proof, he must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden is met when the moving party identifies those portions of the record which demonstrate the absence of material fact. *Id.* at 323, 106 S.Ct. at 2552; *Deines v. Vermeer Mfg. Co.,* 752 F.Supp. 989, 993 (D.Kan.1990).

Once the moving party meets these requirements, the burden shifts to the party resisting the motion, who "must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (emphasis added). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleading." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pac. R.R. Co.,* 740 F.Supp. 1519, 1522–23 (D.Kan.1990).

## III. COMPLIANCE WITH ADMINISTRATIVE REGULATORY SAFETY STANDARDS

In Kansas, a product "shall be deemed not defective by reason of design or performance" when the injury-causing aspect of the product was, at the time of manufacture, "in compliance with ... *administrative regulatory safety standards relating to design or performance."* K.S.A. 60–3304(a) (emphasis added); *see*

---

**2.** Plaintiff notes that Eagle Manufacturing has reformulated its Type I can on numerous occasions throughout the past thirty years in an effort to reduce the cost of producing the cans. Pfeiffer adds that Type I cans consisted of many different models over the past three decades.

**3.** The fire, which occurred after the alleged explosion, destroyed any label relating to Underwriters Laboratories. The initials "FM", however, were embossed on the top of the gasoline can.

also *Chamberlain v. Schmutz Mfg. Co., Inc.,* 532 F.Supp. 588, 590 (D.Kan.1982) (Saffels, J.) (product conforming to administrative regulatory standards shall be presumed not defective); *Savina v. Sterling Drug, Inc.,* 247 Kan. 105, 126–27, 795 P.2d 915, 931 (1990) (drug manufacturer's compliance with FDA regulations on warning creates rebuttable presumption of warning's adequacy). Eagle Manufacturing contends its gasoline can was in "complete compliance" with safety standards promulgated by Underwriters Laboratories and Factory Mutual and that the can was therefore "non-defective as a matter of law."[4]

■ UL and FM are private entities.[5] Safety standards issued by these two organizations are merely voluntary. *See Nat'l Kerosene Heaters Ass'n, Inc. v. Commonwealth of Massachusetts,* 653 F.Supp. 1079, 1083–88 (D.Mass.1986) (voluntary UL standard does not constitute mandatory consumer product safety standard).[6] Such standards have neither the force of law nor are they entitled to the presumption of validity which would be accorded administrative regulations. *In the Matter of Analysis of Walsh Trucking,* 215 N.J.Super. 222, 228, 521 A.2d 883, 887 (1987); *see also Folden v. Robinson,* 58 Wash.2d 760, 762–65, 364 P.2d 924, 926–27 (1961) (private institutions cannot be delegated power to make rules and regulations that have force of state law).[7]

**4.** Tests of Eagle Manufacturing's gasoline can conducted by defendant's expert, Dr. Robert V. Wargin, as well as another gas can manufacturer, Safe–T–Way, indicate that the gasoline can is not in compliance with FM and UL standards. Plaintiff's consulting expert, Dr. Ronald Wells, Ph.D., also opines that the gasoline can in question does not comply with UL and FM standards. Dr. Wells testified that defendant's product should have a vent on it to release pressure before pouring and thereby prevent the explosive ejection of gasoline.

**5.** *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 495, 108 S.Ct. 1931, 1934, 100 L.Ed.2d 497 (1988) (Underwriters Laboratories, Inc., is a private certification laboratory); *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 827 F.2d 458, 467 n. 8 (9th Cir.1987) (Underwriters Laboratories is a private corporation that establishes standards for products); *United States Lighting Serv., Inc. v. Llerrad Corp.,* 745 F.Supp. 426, 427 (N.D.Ohio 1990) (Underwriters Laboratories is in business of testing electrical equipment); *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 1986 WL 31689, No. 94–6363, slip op. at 1 (C.D.Cal. Jan. 17, 1986) (Underwriters Laboratories is a private corporation which tests products to determine safety).

**6.** The express language of the standards in question reveals their voluntary nature. The introductory portion of FM Class Number 6051 and 6052 states as follows:

1.3 The requirements of this standard are intended as *guidelines* reflecting current Factory Mutual approval tests and practices. Containers which do not precisely conform to these requirements may be approved if they meet the intent of this standard …

FM Class Nos. 6051–52(1.3) (emphasis added). The forward to the UL standard *"Metal Safety Cans—UL 30"* contains similar language:

A. This standard represents the judgment of Underwriters Laboratories, Inc. as to the basic requirements for the construction and performance of the products to be investigated under this category … They are subject to revision as further experience and investigation may show is necessary or desirable.

\* \* \* \* \* \*

D. A product employing materials or having forms of construction differing from those detailed in these requirements may be examined and tested according to the intent of the requirements and, if found to be *substantially* equivalent may be listed.

*Metal Safety Cans—UL 30(A) & (D)* (emphasis added).

**7.** When the Consumer Product Safety Commission was petitioned to develop a mandatory product standard for portable gasoline cans in August of 1978, the Commission expressly stated in a briefing paper that the UL and FM standards now relied upon by Eagle Manufacturing are private, voluntary standards. The paper states in pertinent part as follows:

VOLUNTARY STANDARDS

Listed below are a number of existing voluntary standards for "safety" gasoline cans. Apparently, however, most of the 1 to 5 gallon metal containers commonly used by consumers for the use and storage of gasoline do not meet any of these standards …

* Underwriters Laboratories (UL) Standard Number 30 for Metal Safety Cans for Flammable Liquids (1–5 gallons);

* Factory Mutual Approval Standard for Safety Containers and Filling Supply and Disposal Containers (FM 6051);

* National Fire Prevention Association (NFPA) Flammable and Combustible Liquids Code (NFPA 30–77);

\* \* \* \* \* \*

The UL, FM and NFPA standards each require cans to have some of the following features in order to be termed "safety" cans:

When a legislative or administrative body promulgates a statute or regulation, the resulting safety standard is the byproduct of open hearings, debate, and intense scrutiny by the legislature or government agency and input from all interested parties.[8] The same safeguards do not exist in the case of voluntary standards drafted by private organizations. FM and UL standards do not receive the careful deliberation and testing that goes into the formulation of safety regulations enacted by the state and federal governments.

Voluntary standards are, in many cases, drafted by the very corporations which design and manufacture the product.[9] To give such standards the same weight and force as those enacted by a state or federal government would defeat the purpose of the Kansas Product Liability Act. Manufacturers of products would obviously opt to observe less stringent, cost-saving standards established by themselves or other private organizations, rather than comply with what in most instances would be more exacting regulatory safety standards enacted by administrative agencies or legislatures.[10] We believe that the Kansas Su-

preme Court would hold that compliance with voluntary safety standards such as UL or FM does not mean that the product "shall be deemed not defective" under K.S.A. 60–3304(a).

■ Eagle Manufacturing also claims that the relevant UL and FM standards pertaining to gasoline cans have been adopted by the Occupational Safety and Health Administration (hereinafter "OSHA") in 29 C.F.R. § 1910.106, thereby vindicating its product under the Kansas Product Liability Act.[11] Defendant's argument is without merit.[12] Eagle Manufacturing exaggerates the effect of an OSHA definition. The cited Federal Regulation merely defines a "safety can" to mean an approved container with a five-gallon capacity, spring-closing lid, and spout cover *"so designed* that it will safely relieve internal pressure when subjected to fire exposure." 29 C.F.R. § 1910.106(a)(29) (emphasis added).

Section 1910.106 is not a "safety standard." This OSHA regulation merely specifies a quantity, lid, and cover for safety cans. Moreover, the standards contained

---

spring-loaded caps, pressure release valves, flame arrestors, and features to control leakage ...
D. Noble & E. Tyrrell, *Briefing Paper on Petition CP 78–17* (Aug. 7, 1978).

**8.** The Consumer Product Safety Commission, for example, promulgates safety standards only after the text of a proposal is published in the Federal Register, interested persons are invited to comment with respect to other possible alternatives, and the Commission determines that compliance with the proposed standard "is likely to result in the elimination or adequate reduction of the risk of injury" and there is likely to be "substantial compliance" with the standard. *See* 15 U.S.C. § 2056(a) (promulgation of consumer product safety standards); 15 U.S.C. § 2058 (administrative procedure governing promulgation of consumer product safety rules).

**9.** In the present case, Eagle Manufacturing has served on committees which develop standards pertaining to its own products. John J. Paull (hereinafter "Paull") of Eagle Manufacturing attended an American Society of Testing and Materials (hereinafter "ASTM") standard committee meeting on July 27, 1983. Paull and Jerry Gillispie (hereinafter "Gillispie"), another employee of Eagle Manufacturing, attended a sec-

ond ASTM standards meeting on October 4th of that same year in Washington, D.C.

**10.** *Cf. Nat'l Kerosene Heater Ass'n, Inc. v. Commonwealth of Massachusetts, supra,* 653 F.Supp. at 1088 (manufacturers would attempt to preempt inconvenient state or local laws if voluntary industry standards were equated with mandatory safety standards).

**11.** The OSHA definition cited by Eagle Manufacturing was established "as rapidly as possible and without regard to the rulemaking provisions of the Administrative Procedure Act." 29 C.F.R. § 1910.1(a). The purpose of the Administrative Procedure Act is to open the administrative processes of our federal government to the scrutiny of the general public. *Renegotiation Bd. v. Bannercraft Clothing Co.,* 415 U.S. 1, 17, 94 S.Ct. 1028, 1037, 39 L.Ed.2d 123 (1974); *see also* 5 U.S.C. § 552 (public information; agency rules, opinions, orders, records, and proceedings); 5 U.S.C. § 552b (open meetings). Interested persons are given an opportunity under the Act to "participate in [agency] rule making through submission or written data, views, or arguments." 5 U.S.C. § 553(c).

**12.** Further, a careful examination of UL 30 and FM 6051 and 6052 reveals that these standards are not even consistent among themselves.

in section 1910 apply only to the working conditions of employees. *See* 29 C.F.R. § 1910.5. They were not promulgated to ensure that manufacturers produce safe products. Rather, the Department of Labor's Occupational Health and Safety Administration issued the standards contained in section 1910 to protect employees from dangerous working conditions. When these OSHA regulations are violated, the employer, not a manufacturer, is held responsible for the infraction. *See* 29 C.F.R. § 1910.5(f).[13] The court is of the opinion that the Kansas Supreme Court would hold that the above OSHA definition is not an "administrative regulatory safety *standard* relating to design or performance."

## IV. ADDITIONAL PRECAUTIONS

■ A plaintiff may overcome the presumption a product acquires when in compliance with regulatory standards, by establishing "by a preponderance of the evidence that a reasonably prudent product seller could and would have taken additional precautions." K.S.A. 60–3304(a); *see also O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1443 (10th Cir.1987) (compliance with regulatory standards is not dispositive if claimant shows reasonable manufacturer would have done more); *Dreesen v. W.W. Henry Co.*, 1990 WL 198818, No. 87–1378, slip op. at 4 (D.Kan. Nov. 30, 1990) (plaintiff may rebut presumption that product is nondefective). Professor William E. Westerbeke of the University of Kansas School of Law has stated that the burden by which a claimant may overcome the pre-

sumption of nondefectiveness is "relatively weak" because "any evidence of a feasible alternative safer design, warning or instruction should create a jury question on the rebuttal issue." W. Westerbeke, *Some Observations on the Kansas Product Liability Act* (Part 2) 54 J.K.B.A. 39 (1985).[14]

■ Plaintiff has pointed out several areas in which Eagle Manufacturing's can has been deficient. A consumer safety publication warned of problems existing in gasoline cans manufactured by defendant. In 1973, *Consumer Reports* evaluated Eagle Manufacturing's gas can and concluded that its spring-loaded cap leaked and that pouring was especially difficult because the defendant's can lacked any separate pour-venting provision. *See Consumer Reports* 332–35 (May, 1973). Again, in 1981, *Consumer Reports* noted that the lack of a vent was a disadvantage of Eagle Manufacturing's safety can and therefore down-rated defendant's product. *See Consumer Reports* 168–71 (March 1981).

Eagle Manufacturing was also cautioned by a manufacturer of petroleum products that Eagle Manufacturing may not have properly accounted for the pressure that can build up in its gasoline cans. In October of 1982, E.N. Davis, manager of the Analytical Department of ARCO Petroleum Products Company, warned the president of Eagle Manufacturing, John J. Paull, that the pressure curve utilized by defendant for heated gasoline was not accurate. Davis also advised defendant that the fullness of its can may lead to "significantly higher" pressures.[15]

13. Even if OSHA's definition of "safety can" were an administrative regulatory safety standard, we conclude that this regulation does not satisfy the requisite level of safety. *See Alvarado v. J.C. Penney Co., Inc.*, 735 F.Supp. 371, 374 (D.Kan.1990) (presumption that product in compliance with regulatory standards is not defective may be rebutted by evidence that standard does not meet necessary level of safety). The provision does not state the manner in which manufacturers shall "design" such cans to ensure that they "safely relieve internal pressure when subjected to fire exposure."

14. Professor Westerbeke adds that the provision of the Kansas Product Liability Act that permits plaintiffs to rebut the presumption of nondefectiveness "is perhaps weaker than the prior Kan-

sas test that compliance with safety standards 'may be conclusive in the absence of special circumstances.'" W. Westerbeke, *Some Observations on the Kansas Product Liability Act* (Part 2) 54 J.K.B.A. 39 (1985).

15. More specifically, Davis stated the following in correspondence dated October 28, 1982:

I am a little concerned with the curve enclosed with your letter showing pressure vs. temperature for gasoline, naptha and kerosene. The curve indicates a pressure of about 5 psi at 100 degrees fahrenheit which would not be typical of most gasolines in the market place today. *Typical summer grade 10–15 psi at 100 degrees fahrenheit,* and winter fuels will be from 10–15 psi at 100 degrees fahren-

One gallon of gasoline is capable of releasing the explosive force of eighty-one pounds of dynamite. *See Explosafe Report* ("Saving Lives and Property"). The gasoline can produced by Eagle Manufacturing, when filled to its capacity, therefore has the explosive potential of over 400 pounds of dynamite. Despite the tremendous explosive power of the gasoline carried in defendant's containers, there is no indication that Eagle Manufacturing engaged in any design safety testing or review of its gasoline cans. Since John Gillispie became defendant's chief engineer in 1972, there have not been any safety evaluations or design safety improvements of gasoline cans manufactured by Eagle. In fact, there is no evidence that defendant performed market studies, drafted performance specifications, formulated design objectives, or carried out predictive analysis of safety problems with its gas can.

In the early 1980's, another gasoline can manufacturer, Safe–T–Way, discovered, after conducting its own tests and evaluations, the "flame thrower" hazard, a pressurized release of gasoline mist and vapors from the spout of a heated safety can. The threat of such a pressurized release was inherent in the design of conventional gasoline cans at that time. Safe–T–Way therefore developed a "spray deflector" to correct the "flame thrower" effect. Eagle Manufacturing knew, or at least should have known, of the danger of pressurized releases from heated gasoline cans. Defendant's files contained Safe–T–Way informational literature concerning the spray deflector cap as early as 1982.

Even though Eagle Manufacturing had information about the spray deflector cap, defendant did not make any effort to eliminate the "flame thrower" effect or even evaluate its can to determine whether the can was susceptible to the pressurized release of mist or vapors. In light of Safe–T–Way's discovery of pressurized releases of gas and its development of a deflector cap to protect consumers from this hazard, we believe that a jury could find a reasonably prudent manufacturer of gasoline cans would have taken precautions in addition to those safety features specifically addressed by UL and FM. The court will therefore deny the motion of Eagle Manufacturing for summary judgment as to additional precautions.

## V. DUTY OF MANUFACTURER TO WARN

■ Ordinarily, a manufacturer has a duty under Kansas law to warn consumers and users of its products when it knows or has reason to know that its product is or is likely to be dangerous during normal use. *Deines v. Vermeer Mfg. Co.*, 755 F.Supp. 350, 353 (D.Kan.1990); *Jones v. Hittle Serv., Inc.*, 219 Kan. 627, 634–35, 549 P.2d 1383, 1391 (1983).[16] The duty to warn is a continuous one, requiring the manufacturer to keep abreast of the current state of knowledge of its products as acquired through research, adverse reaction reports, scientific literature, and other available methods. *Mason v. Texaco*, 741 F.Supp. 1472, 1482 (D.Kan.1990); *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 405, 681 P.2d 1038, 1053, (quoting *Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87, 91 (2d Cir.1980)), *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984). A manufacturer's failure to adequately warn of its product's reasonably foreseeable dangers renders that product defective under the doctrine of strict liability. *Men-*

---

heit. This curve shows a somewhat steeper slope for gasoline than would be predicted from the API nomograph. Secondly, I am unsure what the notation "all fill conditions" means. If a can is filled with liquid full or without sufficient vapor space to allow vapor-liquid equilibrium to occur, the pressure inside the can will be *significantly higher* than those observed on the monograph and not easily predicted unless all variables are known including the exact fuel composition.

Letter from E.N. Davis to John J. Paull (Oct. 28, 1982) (discussing vapor pressure).

16. A product warning "may be inadequate in factual content, the expression of facts, or in the method by which it is conveyed." *Graham v. Wyeth Laboratories*, 666 F.Supp. 1483, 1498 (D.Kan.1987). As a practical matter, the adequacy of a warning is determined by the application of a negligence theory. *Id.* at 1499; *Deines v. Vermeer Mfg. Co.*, 755 F.Supp. 350, 353 (D.Kan.1990).

*ne v. Celotex Corp.,* 861 F.2d 1453, 1457 n. 3 (10th Cir.1988), *reh'g denied,* No. 86–2350 (10th Cir. Jan. 26, 1989); *Stratton v. Garvey Int'l, Inc.,* 9 Kan.App.2d 254, 258, 676 P.2d 1290, 1294 (1984).

Eagle Manufacturing claims that by virtue of K.S.A. 60–3305 it is relieved from the responsibility of warning Pfeiffer against any dangers or hazards which arise in the use of its product. Under this provision of Kansas law, the duty to warn does not extend to "warnings protecting against ... safeguards, precautions and actions which a reasonable user or consumer of the product ... should or was required to possess." K.S.A. 60–3305(a). In addition, a manufacturer cannot be held liable for "dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product." K.S.A. 60–3305(c).[17]

## A. *Open and Obvious Danger*

■ Eagle Manufacturing claims that the dangers associated with gasoline spraying out of its "safety can" under pressure are so open and obvious that Pfeiffer should have realized this hazard, and therefore it had no duty to warn plaintiff. A product which contains an open and obvious danger can still be unreasonably dangerous. *See Siruta v. Hesston Corp.,* 232 Kan. 654, 664, 659 P.2d 799, 806 (1983) ("Simply because the hazard on a piece of equipment is open and obvious does not prevent it from being dangerous to the operator or consumer"). Although an open

and obvious danger certainly is material to whether a product itself is unreasonably dangerous, it is not conclusive. *See Wheeler v. John Deere Co.,* 935 F.2d 1090, 1097 (10th Cir.1991) (citing *Lockley v. Deere Co.,* 927 F.2d 1430, 1435 (8th Cir.1991)) (obviousness of defect is only one factor to be considered in determining whether defect is unreasonably dangerous).[18] Rather,

> [w]hether a danger is open and obvious depends not just on what people can see with their eyes but also on what they know and believe about what they see. In particular, if people generally believe that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in the way generally believed to be safe is not open and obvious.

*Id.* (quoting *Corbin v. Coleco Indus., Inc.,* 748 F.2d 411, 417–18 (7th Cir.1984)).

In the case at bar, Pfeiffer's previous experience with gasoline cans gave him no reason to believe that internal pressure would cause gasoline to spray from defendant's can. Plaintiff merely poured gas from the can in a manner that he believed would be safe based on his prior use of such cans. Eagle Manufacturing has not presented any evidence to suggest that a reasonable user or consumer would utilize a different method of pouring gasoline from its product. Further, there is no indication that Pfeiffer possessed any special knowledge of the alleged spraying defect. The court will deny defendant's summary judgment motion as to its duty to warn.

---

**17.** Subsections (a) and (c) of K.S.A. 60–3305 provide in pertinent part as follows:

> In any product liability claim any duty on the part of the manufacturer or seller of the product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend: (a) To warnings, protecting against or instructing with regard to those safeguards, precautions and actions which a reasonable user or consumer of the product, with the training, experience, education and any special knowledge the user or consumer did, should or was required to possess, could and should have taken for such user or consumer or others, under all the facts and circumstances; ... (c) to warnings, protecting against or instructing with regard to dangers,

> hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product.

K.S.A. 60–3305(a) & (c); *see also Miller v. G & W Elec. Co.,* 734 F.Supp. 450, 454 (D.Kan.1990); *Wessinger v. Vetter Corp.,* 716 F.Supp. 537, 540 (D.Kan.1989); *Olson v. U.S. Indus., Inc.,* 649 F.Supp. 1511, 1517 (D.Kan.1986); *Chamberlain v. Schmutz Mfg. Co.,* 532 F.Supp. 588, 591 (D.Kan.1982); *Mays v. Ciba–Geigy Corp.,* 233 Kan. 38, 60, 661 P.2d 348, 365 (1983).

**18.** *See also Lenherr v. NRM Corp.,* 504 F.Supp. 165, 172 (D.Kan.1980) (where manufacturer fails to give adequate and timely warnings as to danger, product may be defective even if product was designed precisely as intended).

**B.** *Experienced User Defense*

Eagle Manufacturing argues that it is spared from the duty to warn Pfeiffer of dangers associated with its gasoline can because plaintiff had "extensive experience" in using such cans. In light of the facts in the instant case, this argument has no merit whatsoever. There is absolutely no evidence that Pfeiffer should have appreciated the risk that internal pressure would cause gasoline to explosively expel from the can's spout. Even if he had some comprehension of the danger of injury attendant with his activity, mere knowledge of the danger of doing a certain act without a full appreciation of the risk involved is not sufficient to preclude a plaintiff from recovery. *Brooks v. Dietz*, 218 Kan. 698, 708, 545 P.2d 1104, 1113 (1976) (quoting *Wainscott v. Carlson Constr. Co.*, 179 Kan. 410, 413, 295 P.2d 649, 652 (1956)). The explosion in this case did not result from a hazard known to plaintiff and there was no reason for any user or consumer to fathom that such a can would have a propensity to spray gasoline during normal use. The motion of Eagle Manufacturing for summary judgment on the ground that Pfeiffer possessed training, experience, education or special knowledge will be denied.

IT IS THEREFORE ORDERED that the summary judgment motion of defendant Eagle Manufacturing Company (Doc. No. 83) is hereby denied.