**Ann C. HOUSE, individually and as the personal representative of the Estate of Freddie Floyd House, Plaintiff and Appellant,**

v.

**ARMOUR OF AMERICA, INC., a California corporation; Lawco Police Supply, a Utah corporation; E.I. DuPont de Nemours, a Delaware corporation; and John Does III through XX, Defendants and Appellees.**

No. 930552–CA.

Court of Appeals of Utah.

Oct. 31, 1994.

Petitions for Rehearing Filed by Lawco Police Supply and Armour of America, Inc. Denied Dec. 21, 1994.

---

Stewart M. Hanson, Jr., Charles P. Sampson, and Paul M. Simmons, Salt Lake City, for appellant.

David K. Watkiss, David B. Watkiss, and Carolyn Cox, Salt Lake City, for appellees Armour of America and DuPont.

Tim Dalton Dunn and J. Rand Hirschi, Salt Lake City, for appellee Lawco Police Supply.

Before BILLINGS, GREENWOOD and JACKSON, JJ.

## OPINION

BILLINGS, Presiding Judge:

Appellant, Ann C. House (Mrs. House), on behalf of the heirs of Lt. Fred Floyd House (Lt. House), appeals from the summary judg-

ment dismissing her complaint against appellees, Armour of America (Armour), E.I. DuPont de Nemours (DuPont) and Lawco Police Supply Company (Lawco). Mrs. House claims that the trial court erred in granting summary judgment because there were material issues of fact as to whether Lt. House was adequately warned regarding the limitations of his bullet-resistant vest and, thus, whether Lt. House's inadequate knowledge caused his death. We affirm in part and reverse and remand for trial in part.

## FACTS

◼ Summary judgment is only proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R.Civ.P. 56(c). "In reviewing a summary judgment, we analyze the facts and inferences in a light most favorable to the losing party." *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 89 (Utah 1988); *accord Canfield v. Albertsons, Inc.*, 841 P.2d 1224, 1226 (Utah App.1992), *cert. denied*, 853 P.2d 897 (Utah 1993). In considering a motion for summary judgment, it is improper for the trial court or this court on appeal to weigh the evidence or assess its credibility. *Mountain States Tel. & Tel. Co. v. Atkin, Wright & Miles,* 681 P.2d 1258, 1261 (Utah 1984); *accord Reeves v. Geigy Pharmaceutical, Inc.,* 764 P.2d 636, 639 (Utah App.1988). In the instant case, the parties submitted an initial pre-trial order setting forth the contested and uncontested issues of fact. We recite the facts as agreed by the parties drawing inferences therefrom in a light most favorable to Mrs. House and we resolve all contested issues of fact in Mrs. House's favor. *Blacker Appliance,* 770 P.2d at 89.

### The Parties

Mrs. House is the widow of Lt. Fred House and the personal representative of Lt. House's estate. Mrs. House filed this wrongful death action on behalf of Lt. House's heirs, including herself and their three minor children.

Armour is a California corporation engaged in the business of designing, manufacturing, testing and selling bullet-resistant vests or "soft body armor." In addition to soft body armor, Armour also designs, manufactures, tests and sells hard body armor in the form of ceramic plates, which can be inserted into the front or back pocket of certain soft body tactical vests.

Lawco, now defunct, was a Utah corporation engaged in the business of selling law enforcement supplies such as bullet resistant vests. Lawco marketed vests from several different body armor manufacturers.

DuPont is a Delaware corporation that developed, manufactures and sells KEVLAR, the registered trademark for a family of aramid fibers incorporated into the ballistic fabric woven into bullet-resistant vests. DuPont does not manufacture or sell bullet-resistant armor. However, it has extensively tested ballistic fabrics woven from KEVLAR and has encouraged, through brochures and informational videos, law enforcement officers to wear such vests.

### Background Facts

In 1973, Lt. House began working as a corrections officer for the Utah State Department of Corrections (Department). Lt. House received significant training during his tenure with the Department, and ultimately advanced to become a member of one of the Department's two Special Weapons And Tactics (SWAT) Teams, a senior supervisor, a Category I weapons instructor, and commander of the canine unit for the Utah State Prison Special Operations Team.

In 1980, when the Department began its SWAT Team program, Lt. House and other team members determined they should purchase bullet-resistant vests. Before purchasing these vests, Lt. House and the other officers researched the various types of body armor available. The team contacted several body armor retailers and sales representatives and invited them to visit the prison to demonstrate the vests and to provide the team with information. The brochure that Armour distributed at that time provided information regarding the four basic grades of soft body armor that Armour then manufactured, as well as a chart of the handgun

rounds that each grade could withstand. Armour claims that in addition to making this brochure available to parties interested in purchasing body armor, Armour also included the brochure within the plastic packaging of each Armour vest sold. It is disputed whether the vests purchased by the Department from Lawco were accompanied by, or whether the officers saw and read, this Armour brochure and information booklet. Thus, for purposes of this appeal, we assume that Lt. House and his colleagues did not read the Armour brochure.

In June 1981, the team, after a bidding process, purchased nine Armour AHP concealable vests and one Armour AHP tactical vest plus a hard armor ceramic insert from Lawco. All ten of the vests had an attached label containing the following information:

THIS VEST WILL CONTAIN
44 MAG. 240 GR. (6″ BBL)
U.S.A. 9mm 124 GR. FMJ
357 MAG. 125 FR. SJHP (6″ BBL)
22 MAG. (6″ BBL) 38 CAL 00 BUCKSHOT

NOT FOR A.P. ROUNDS
ARMOUR OF AMERICA
BEVERLY HILLS, CA 90213

DO NOT MACHINE WASH
OR DRY CLEAN

CLEAN WITH DAMP CLOTH AND
SMALL AMOUNT OF SOAP.

*The Siege at Marion*

In January 1988, following the bombing of a church in Marion, Utah, Lt. House and other members of the Department's SWAT team were called to assist federal and state officers during a thirteen day stand-off with Addam Swapp and other members of the Singer–Swapp family. On January 28, 1988, while carrying out a plan designed by the FBI to apprehend Addam and Jonathan Swapp, Lt. House was shot and killed.

Under the FBI plan, Lt. House and Officer Jerry Pope were to release their dogs from the "Green" house (also called the "Bates" house), a home on the Singer–Swapp compound facing the barricaded Vickie Singer house. Lt. House, Officer Pope and several FBI agents had secreted themselves in the "Green" House to take down Addam and Jonathan Swapp as they walked across the compound to the goat pen to milk the animals. At approximately 8:30 a.m., Addam and Jonathan exited the Vickie Singer house and proceeded across the compound. Each carried a rifle slung over his shoulder. As they returned to the house, Lt. House and Officer Pope were given an order to release their dogs to bring down the two men. Lt. House, who was slightly in front of the other officers, opened the door to the "Green" house and he and Officer Pope alerted and released the dogs. Almost instantly, Timothy Singer began firing rifle shots from an upstairs bedroom of the barricaded Vickie Singer home directly through the open doorway and into the entryway where Lt. House, Officer Pope and several FBI agents were located. Lt. House was fatally shot by one of the first rounds fired. Following Lt. House's death, criminal prosecutions ensued against Timothy Singer and Addam Swapp. *See State v. Singer*, 815 P.2d 1303 (Utah App. 1991); *State v. Swapp*, 808 P.2d 115 (Utah App.), *cert. denied*, 815 P.2d 241 (Utah 1991).

Lt. House was wearing his Armour AHP Tactical vest, as well as the hard armor insert, when he was fatally shot by a .30 caliber steel-jacketed round fired from a Plainfield carbine rifle by Timothy Singer. The bullet struck the non-ceramic inside edge of the hard armor chest panel and penetrated through the soft body portion of Lt. House's bullet-resistant vest.

Appellant argues on appeal that there are material issues of fact precluding summary judgment on each of the issues relied upon by the trial judge in granting summary judgment: (1) whether appellees had a duty to warn Lt. House about the capabilities and limitations of his Armour AHP Tactical vest; (2) whether appellees satisfied this duty; (3) whether appellees's failure to warn Lt. House of his vest's limitations proximately caused Lt. House's death; and finally, (4) whether appellee Lawco gave the decedent a

warranty of fitness for a particular purpose and thereafter breached that warranty when the vest failed to perform as represented.

## I. STRICT LIABILITY: FAILURE TO WARN

Mrs. House alleges that Lt. House's bullet-resistant vest was defective, not due to an inherent design or manufacturing defect, but because appellees failed to adequately warn Lt. House of the limitations and capabilities of the vest.

■■■ Under a theory of strict products liability, expressed in section 402A of the Restatement (Second) of Torts and adopted by the Utah Supreme Court,[1] a manufacturer who sells a product in a "defective condition unreasonably dangerous to the user" is strictly liable for any physical harm caused by the defect notwithstanding the fact that the manufacturer "has exercised all possible care in the preparation and sale of his product." Restatement (Second) of Torts § 402A(1), (2)(a) (1965) (hereinafter Restatement). A product is defective or "unreasonably dangerous" to the user if

the product [is] dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community considering the product's characteristics, propensities, risks, dangers and uses together with any actual knowledge, train-

ing, or experience possessed by that particular buyer, user or consumer.

Utah Code Ann. § 78–15–6(2) (1992). Utah law recognizes three types of product defects: design defects, manufacturing flaws, and inadequate warnings regarding use. *Grundberg v. Upjohn Co.*, 813 P.2d 89, 92 (Utah 1991); *see also* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 99, at 695 (5th ed. 1984) (hereinafter Prosser & Keeton).

■■■ Section 402A, comment j, of the Restatement states that a seller *may be* required to provide directions or warnings to the consumer to prevent a product from being unreasonably dangerous. Restatement, *supra*, § 402A cmt. j.[2] Moreover, inadequate warning regarding a product's use may render that product unreasonably dangerous, and a manufacturer who knows or should know of a risk associated with its product may be directly liable to the user if it fails to warn adequately of the danger. *See Grundberg*, 813 P.2d at 97 (holding that drug manufacturer who knows or should know of product risk is directly liable to patient if it fails to warn prescribing physicians of that danger).

### A. Duty To Warn

■■■ As a threshold argument, appellees claim they had no duty to warn Lt. House. It is axiomatic that one is not liable in tort absent a duty. *Utah Power & Light Co. v.*

---

1. This section provides in full:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product; and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relationship with the seller.
 Restatement (Second) of Torts § 402A (1965). The Utah Supreme Court expressly adopted this section of the Restatement in *Ernest W. Hahn,*

*Inc. v. Armco Steel Co.*, 601 P.2d 152, 156–58 (Utah 1979).

2. In pertinent part, § 402A, comment j, provides:

 In order to prevent the product from being unreasonably dangerous, the seller *may be required to give directions or warning* . . . as to its use. . . .
 But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, . . . when the danger, or potentiality of danger, is generally known or recognized. . . .
 Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.
 Restatement, *supra*, § 402A cmt. j (emphasis added).

*Federal Ins. Co.,* 983 F.2d 1549, 1562 (10th Cir.1993) (citing *Loveland v. Orem City Corp.,* 746 P.2d 763, 765–66 (Utah 1987)). The issue of whether a duty exists is a question of law to be reviewed for correctness by this court. *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989) (citing *Weber ex rel. Weber v. Springville City,* 725 P.2d 1360, 1363 (Utah 1986); Prosser & Keeton, *supra,* § 37, at 236).

### 1. The Open and Obvious Danger Rule

 Appellees initially contend they had no duty to warn Lt. House because the danger he encountered was open and obvious. They advance section 402A of the Restatement in support of this proposition. In relevant part, comment j to section 402A provides: "[A] seller is not required to warn with respect to products ... when the danger, or potentiality of danger, is generally known and recognized." Restatement, *supra,* § 402A cmt. j. Whether the "open and obvious" danger rule is applicable in a strict liability action in Utah and what the effect of the doctrine is has not previously been addressed by Utah's appellate courts.

In *Ernest W. Hahn, Inc. v. Armco Steel Co.,* 601 P.2d 152, 158 (Utah 1979), the Utah Supreme Court recognized two affirmative defenses to strict products liability: the consumer's misuse of the product and assumption of risk. The court, however, has not addressed whether the "open and obvious" danger rule may also operate as a defense to strict liability under Utah law. Moreover, in 1989, this court abandoned the "open and obvious" danger rule as a complete defense in a negligence action. *Donahue v. Durfee,* 780 P.2d 1275 (Utah App.1989) (finding the "open and obvious" danger rule "incompatible with Utah's comparative negligence system"), *cert. denied,* 789 P.2d 33 (Utah 1990). In *Donahue,* a land use case, this court found that with the adoption of section 78–27–38 of the Utah Code, enacting Utah's comparative fault statute, "the Utah Legislature [had] by necessary implication abolished the open and obvious danger rule as an absolute bar to an injured [party's] recovery." *Id.* at 1279; *see* Utah Code Ann. § 78–27–38 (Supp.1994). We concluded the obviousness of the danger

is only one factor to be assessed when determining the comparative fault of both parties.

In *Mulherin v. Ingersoll–Rand Co.,* 628 P.2d 1301 (Utah 1981), a case involving both a manufacturer's defect and a consumer's misuse of the product, the Utah Supreme Court announced that the comparative fault principles enunciated in Utah Code Ann. § 78–27–38 applied with equal force in strict product liability actions. The court held "where the faults of both plaintiff and defendant have united as concurrent proximate causes of an injury, we hold that both faults should be considered by the trier of fact in determining the relative burden each should bear for the injury they have caused." *Id.* at 1303. The holding in *Mulherin* is indicative of the court's disdain for harsh "all or nothing" rules.

In light of this authority, we follow those jurisdictions that hold the presence of an "open and obvious" danger is merely one factor for the trier of fact to consider when assessing the liability of the defendant in a strict liability case—it does not operate as a complete bar to the injured party's recovery. *See, e.g., Wheeler v. John Deere Co.,* 935 F.2d 1090, 1104 (10th Cir.1991) (providing that even when danger is "open and obvious" product may nevertheless be unreasonably dangerous if more dangerous than reasonably expected by ordinary user or if danger not within cognition of reasonable user); *Pfeiffer v. Eagle Mfg. Co.,* 771 F.Supp. 1133, 1140 (D.Kan.1991) ("Although an open and obvious danger certainly is material to whether a product itself is unreasonably dangerous, it is not conclusive."); *Gunstone v. Julius Blum GMbH.a–6873,* 111 Or.App. 332, 825 P.2d 1389, 1393 (stating manufacturer's duty to warn not obviated where danger is "open and obvious"), *review denied,* 833 P.2d 1283 (Or.1992); *Caterpillar Tractor Co. v. Donahue,* 674 P.2d 1276, 1283–84 (Wyo.1983) (rejecting argument that when defective condition is "open and obvious" defendant cannot be held liable as matter of law). A product may still be unreasonably dangerous if the hazards or risks associated with its use were not such that they should have been realized by a reasonable user or consumer of the product. " '[I]f people generally believe

that there is a danger associated with the use of a product, but that there is a safe way to use it, any danger there may be in using the product in the way generally believed to be safe is not open and obvious.'" *Wheeler,* 935 F.2d at 1104 (quoting *Melton v. Deere & Co.,* 887 F.2d 1241, 1249 (5th Cir.1989) (Reavley, J., dissenting)).

■ In the instant case, Mrs. House acknowledges that there were certain obvious limitations to Lt. House's vest, such as its limited coverage area; however, she contends it was neither open nor obvious to her husband, or anyone else, that he could be killed by a bullet striking both his vest and hard armor insert. Many of Lt. House's colleagues testified they believed that Lt. House's vest, alone, could withstand a rifle round. Further, several officers who knew that Lt. House's vest would not contain rifle fire without the ceramic plate, were surprised the vest did not stop the round that killed Lt. House. Moreover, the record supports Mrs. House's contention that, though obvious, the danger presented by rifle fire was not known by Lt. House himself. A number of Lt. Houses's colleagues testified that he would have been shocked that his vest would not withstand even .30 caliber carbine fire—a lesser threat than a high-velocity rifle round.[3]

Based on this evidence, a jury could reasonably find that the "open and obvious" danger from high-caliber rifle fire was not such that it should have been recognized by Lt. House. Thus, there are material issues of fact sufficient to preclude the trial court's grant of summary judgment.

## 2. The Sophisticated User

Next, appellees insist Lt. House and his colleagues were experts in weapons and ballistics and therefore knowledgeable about rifle fire's inherent potential to cause great harm and even death. Appellees therefore claim they had no duty to warn Lt. House that his vest would not stop rifle fire.

Pursuant to the "knowledgeable and sophisticated user" exception to a manufacturer's duty to warn, "a product supplier has no duty to warn of danger in using the product when the ultimate user possesses special knowledge, sophistication, or expertise; in such cases, the supplier may rely on the professional expertise of the user and tailor its warning accordingly." *Koonce v. Quaker Safety Prod. & Mfg. Co.,* 798 F.2d 700, 716 (5th Cir.1986); *accord Todd Shipyards Corp. v. Hercules, Inc.,* 859 F.2d 1224, 1225 (5th Cir.1988) ("A manufacturer's duty to warn is limited 'where the purchaser or the user has certain knowledge or sophistication, professionally or otherwise, in regard to the product.'") (quoting *American Mutual Liab. Ins. Co. v. Firestone & Rubber Co.,* 799 F.2d 993, 994 (5th Cir.1986)); *Pavlides v. Galveston Yacht Basin, Inc.,* 727 F.2d 330, 338 (5th Cir.1984) (finding manufacturer of product marketed exclusively for use by experienced professional may tailor its warning accordingly).

■ The rationale behind the "sophisticated or knowledgeable user" exception is that the user's knowledge of the danger is equivalent to prior notice. *Billiar v. Minnesota Mining & Mfg. Co.,* 623 F.2d 240, 243 (2d Cir.1980) ("No one needs notice of that which he already knows."); *accord Borowicz v. Chicago Mastic Co.,* 367 F.2d 751, 758 (7th Cir.1966). "It is not the knowlege actually possessed by the plaintiff, individually, that determines whether the absence of a warning renders a product unreasonably dangerous," *Jackson v. Coast Paint & Lacquer Co.,* 499 F.2d 809, 812 (9th Cir.1974); rather, the touchstone is what is "generally known" about the product in the "community" to which the plaintiff belongs. *Id.* To determine the level of knowledge which may be imputed to Lt. House, we thus look to what was "generally known" by the other officers in the Department's law enforcement "community," especially those officers on the SWAT Team.

Mrs. House claims that the conflicting evidence regarding Lt. House's and the Department's knowledge of the limitations and ca-

---

**3.** Officer Will Fowlke testified that the vest "did not do what it was supposed to," and that it was "a shock that ... the Cadillac vest didn't perform." Officer Wayne Jorgensen stated Lt. House would "have been damn surprised" a .30 caliber carbine round passed through his vest and went right through him as well.

pabilities of his bullet-resistant vest render application of the sophisticated user rule as a matter of law inappropriate. In general, when the extent of a community's expertise or knowledge of a particular danger is in dispute, courts have left the question of whether there was a duty to warn to the trier of fact. *See, e.g., Koonce,* 798 F.2d at 716; *Billiar,* 623 F.2d at 244; *Graham v. Joseph T. Ryerson & Sons,* 96 Mich.App. 480, 292 N.W.2d 704, 707–08 (1980).

It is undisputed that Lt. House was a well-trained officer and a skilled weapons instructor. However, we have not found any evidence that any of the extensive training completed by Lt. House or other members of the SWAT Team involved the use and capabilities of body armor.[4] Moreover, the evidence shows the Department's weapons instructor training consisted only of caring for and shooting firearms. Lt. House's brother and fellow officer, Tom House, testified that none of the weapons training provided by the Department included training in ballistics or the velocity of bullets. Likewise, Officer Will Fowlke, who trained Lt. House as a weapons instructor, testified that as a weapons trainer himself, he was not an expert in body armor, bullet velocities, or the effect of barrel length on bullet velocity or penetrating effect.

Moreover, Officer Tom House testified that he believed Lt. House's vest "would stop up to and including the heaviest ammunition that we ourselves fired." Further, Officer House believed that the heavy plate Lt. House always wore in his vest was only a "trauma plate," whose "primary purpose ... was to protect the body from blunt trauma that could occur even if the vest stopped the bullet." He did not believe the plate was necessary to withstand a rifle round.

Officer Jerry Pope, who was present with Lt. House when he was fatally shot, testified that he knew his own vest—which was purchased five years after Lt. House's vest—would not stop a rifle round because the label on his vest so provided. After he was shown a copy of the label on Lt. House's vest—which did not include any warning that rifle

fire was beyond the capabilities of the vest—he testified that, based upon the label, he would have expected Lt. House's vest to stop a .30 caliber carbine even without the ceramic insert.

Finally, Officer Karl Bartell testified that he knew Lt. House's vest "wouldn't stop a 30.06 without the trauma plate," but that he believed if a bullet struck "any place on [the] plate it should stop."

Based upon the label's sparse warning and this record testimony detailing the confusion of Lt. House's colleagues regarding the capabilities of his vest, we conclude that the question of whether the sophisticated user doctrine obviated appellees' duty to warn is for the jury to decide. Accordingly, we reverse and remand the issue for trial.

**B. Satisfaction of the Duty to Warn**

■ Further, Mrs. House alleges that there are material issues of fact as to whether appellees satisfied their duty to warn. She asserts that the only information that Armour and Lawco clearly disseminated to Lt. House was the label on his vest. The label on all the Armour vests purchased by the Department read as follows:

THIS VEST WILL CONTAIN
44 MAG. 240 GR. (6″ BBL)
U.S.A. 9mm 124 GR. FMJ
357 MAG. 125 FR. SJHP (6″ BBL)
22 MAG. (6″ BBL) 38 CAL 00 BUCKSHOT

NOT FOR A.P. ROUNDS
ARMOUR OF AMERICA
BEVERLY HILLS, CA 90213

DO NOT MACHINE WASH
OR DRY CLEAN

CLEAN WITH DAMP CLOTH AND
SMALL AMOUNT OF SOAP.

Mrs. House contends that appellees could easily have included a warning that the vest

---

4. Officer Tom House stated that in all of the training he completed alone, or in conjunction with Lt. House, the appropriate use of body armor was never discussed. Officer Mark Roberts testified that while he was employed by the Department he never received any formal training in the capabilities and limitations of soft body armor, nor does he recall whether any other officer in the Department received this training.

alone would not stop rifle fire. In support of this contention, Mrs. House points to the vest worn by Officer Jerry Pope, who was with Lt. House the morning of the fatal shooting. Officer Pope's vest bore a warning on the label that the vest would not stop rifle fire.

██ Whether the warning provided by the label was adequate presents a question of fact, to be resolved by the trier of fact. *DeBry v. Valley Mortgage Co.*, 835 P.2d 1000, 1004 (Utah App.1992), *cert. denied*, 853 P.2d 897 (Utah 1993). It was error for the trial court to grant summary judgment on this issue unless reasonable minds could reach only one result taking all disputed facts and inferences in a light most favorable to Mrs. House. *See Apache Tank Lines, Inc. v. Cheney*, 706 P.2d 614, 615 (Utah 1985); *Darrington v. Wade*, 812 P.2d 452, 459 (Utah App.1991).

██ Again, in order for a warning to be adequate, it must completely disclose all the risks involved, as well as the extent of those risks. "A warning must (1) be designed so it can reasonably be expected to catch the attention of the consumer; (2) be comprehensible and give a fair indication of the specific risks involved with the product; and (3) be of an intensity justified by the magnitude of the risk." *Pavlides*, 727 F.2d at 338. The overall adequacy of the warning given to Lt. House must be judged in light of the ordinary knowledge common to members of the law enforcement community. *See* discussion *supra; Guevara v. Dorsey Lab.*, 845 F.2d 364, 367–68 (1st Cir.1988).

The vest's label is the only undisputed fact regarding whether Lt. House and the other officers knew the limitations of the vest, and thus whether appellees's adequately warned the Team. Based upon the testimony presented at the hearing and in the depositions, it is disputed whether Lt. House received the Armour information booklet or brochure. Moreover, no member of the SWAT Team could recall, specifically, whether they ever saw such a brochure.[5] Based upon the understanding as to the vest's capabilities pre-viously discussed, we cannot say as a matter of law that appellees satisfied their duty to warn.

## II. CAUSATION

██ Mrs. House maintains that there is sufficient evidence to create a genuine issue of material fact as to whether appellees' failure to warn Lt. House of the limitations and capabilities of his vest caused him to expose himself to greater risks and dangers than he otherwise would have, thus causing his death. She contends that had Lt. House believed, as Officer Jerry Pope did, that his vest could not contain a rifle round, he would not have agreed to be the point man that morning. Finally, she insists that a reasonable jury could conclude that had Lt. House and the other officers been better informed of the limitations of his vest, they would have adopted a different arrest plan—one that would not have exposed Lt. House and the other officers to the same degree of risk. Therefore, Mrs. House argues the trial court erred in granting summary judgment on the issue of whether any failure of appellees to warn caused Lt. House's death.

██ Before a manufacturer may be held liable for a failure to warn, that failure must be both the cause-in-fact and the proximate cause of the user's injury. *See Conti v. Ford Motor Co.*, 743 F.2d 195, 197 (3d Cir. 1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 784 (1985). Further, questions relating to proximate cause generally present a question of fact to be decided by the jury. *See Apache Tank Lines, Inc. v. Cheney*, 706 P.2d 614, 615 (Utah 1985); *Rees v. Albertsons, Inc.*, 587 P.2d 130, 133 (Utah 1978). However, when reasonable jurors could not conclude that the defendant's actions were the proximate cause of the plaintiff's injury, proximate cause may be decided by the judge as a question of law. *See Lunt v. Mount Spokane Skiing Corp.*, 62 Wash. App. 353, 814 P.2d 1189, 1194, *review denied*, 118 Wash.2d 1007, 822 P.2d 288 (1991).

---

5. Officers Tom House and Wayne Jorgensen testified that there were no brochures enclosed in the plastic covers for their vests. Wayne Wadman and Thomas Carlson, two former Lawco employees, testified they could not recall whether any information, other than the label, accompanied the Armour vests they sold to the Department.

■ A breach of duty cannot be the proximate cause of an injury "if the event which produced the injury would have occurred regardless of the defendant's conduct." *Id.* 814 P.2d at 1194. When an actor knows there is a risk, but chooses to act in the face of that risk, any additional warning by the manufacturer serves no purpose in avoiding the harm. *Id.* Thus, unless Mrs. House has alleged sufficient facts to create a material issue of fact as to whether her husband would have behaved differently had a more detailed warning been given, appellees' failure to warn is not, as a matter of law, the proximate cause of Lt. House's death.

Mrs. House points to testimony from members of the SWAT Team that indicates Lt. House had high expectations for his vest. Members of the Team testified Lt. House was more confident and acted differently after receiving his vest. Officer Wayne Jorgensen stated Lt. House told him he felt he was "superman" when he had his vest on; that Lt. House would allow the other officers to punch him or strike him with their batons; and, on one occasion while wearing his vest, offered to let them take a shot at him with a 9 mm handgun. One officer even testified that Lt. House thought "he was God" or close to it when he wore his vest.

■ Further, Mrs. House claims the court should have granted her a "heeding presumption" to assist her burden on the issue of causation. She contends that because neither party can establish what Lt. House would have done had he known all of the limitations and capabilities of his bullet-resistant vest, the court should have applied a presumption that Lt. House would have heeded a warning had it been given. *See Koonce v. Quaker Safety Prod. & Mfg.*, 798 F.2d 700, 716 (5th Cir.1986).[6] Whether a heeding presumption is available in Utah is an issue of first impression.

When no warning, or when an inadequate warning, is given, the so-called "heeding presumption" allows the finder of fact to presume that the product user would have "heeded" or followed a warning had the manufacturer given one. *See Coffman v. Keene Corp.*, 133 N.J. 581, 628 A.2d 710, 716 (1993). This rebuttable presumption shifts the plaintiff's burden on causation and allows the trial court to instruct the jury that, had an adequate warning been given, a reasonable consumer or user would have read and heeded the warning.

The "heeding presumption" adopted in many failure-to-warn cases is grounded both in the Restatement (Second) of Torts and in public policy. In relevant part, comment j of the Restatement provides: "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." Restatement, *supra*, § 402A cmt. j. As a corollary, many jurisdictions have concluded that "because a manufacturer or seller would benefit when a warning was provided, ... 'a buyer or user should benefit where a warning is *not* given.' " *Coffman*, 133 N.J. 581, 628 A.2d at 717 (quoting *Coffman v. Keene Corp.*, 257 N.J.Super. 279, 608 A.2d 416 (1992)); *see Reyes v. Wyeth Lab.*, 498 F.2d 1264, 1281 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, 681 P.2d 1038, 1057, *cert. denied,* 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984); *Butz v. Werner*, 438 N.W.2d 509, 517 (N.D.1989). Still other courts have adopted the presumption without specific reference to comment j, instead grounding the presumption in public policy. *See Payne v. Soft Sheen Prods., Inc.*, 486 A.2d 712, 725 (D.C.1985); *Cunningham v. Charles Pfizer & Co.*, 532 P.2d 1377, 1382 (Okla.1974).

6. Alternatively, Mrs. House contends that if this court does not adopt the "heeding presumption," public policy demands that when the manufacturer fails to provide an adequate warning, this failure creates an inference that it was both the cause-in-fact and the proximate cause of the harm. *See O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1442 (10th Cir.1987) (noting un-

der Kansas law inadequate warning creates presumption of causation), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988); *Mason v. Texaco, Inc.*, 741 F.Supp. 1472, 1505 (D.Kan.1990) (same), *aff'd,* 948 F.2d 1546 (10th Cir.1991), *and cert. denied,* —— U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992).

While empirical data may not demonstrate the soundness of a heeding presumption, we agree with the Supreme Court of New Jersey that "an examination of the strong and consistent public policy which supports and shapes our laws governing strict products liability demonstrates the justification for such a presumption." *Coffman,* 133 N.J. 581, 628 A.2d at 718. The concept of strict products liability itself arose in part due to a settled societal expectation that persons who have not misused a product, but who have nonetheless been injured, should be compensated for the manufacturer's failure adequately to design, manufacture, or warn about the inherent limitations of that product. Adequate product warnings are essential to ensure that products are reasonably safe for their intended uses. "The heeding presumption thus serves to reinforce the basic duty to warn—to encourage manufacturers to produce safer products, and to alert users of the hazards arising from the use of those products through effective warnings." *Id.* We therefore adopt the view that in cases in which it cannot be demonstrated what the plaintiff would have done had he or she been adequately warned, the plaintiff should be afforded a rebuttable presumption that he or she would have followed an adequate warning had one been provided.[7]

Based upon the foregoing, we conclude there is a material issue of fact regarding whether appellees' failure to warn was the proximate cause of Lt. House's death. We thus remand for trial on the issue of causation.

## III. APPELLEE DUPONT'S DUTY AND OPPORTUNITY TO WARN

■ DuPont asserts that the uncontested facts establish that it had neither a duty nor an opportunity to warn Lt. House of the limitations of his bullet-resistant vest. Further, DuPont contends that if it did, voluntarily, undertake a duty to warn law enforcement in general of the capabilities of soft body armor, it fulfilled this duty by consistently providing accurate information about the product's characteristics. Moreover, DuPont notes that it did not begin to provide promotional or informational materials regarding the ballistic properties of soft body armor until the mid–1980's—Lt. House purchased his vest in 1981—therefore it was under no duty at that time. *See Estate of Kimmell v. Clark Equip. Co.,* 773 F.Supp. 828, 830–31 (W.D.Va.1991) (holding existence of duty to warn must be evaluated at time product is manufactured and sold).

"Strict liability may extend not only to the dealer and retail seller of the product, but to the manufacturer of the product and the manufacturers of its component parts." *Oak Grove Investors v. Bell & Gossett Co.,* 99 Nev. 616, 668 P.2d 1075, 1080 (1983); *accord Rocky Mountain Fire & Casualty Co. v. Biddulph Oldsmobile,* 131 Ariz. 289, 640 P.2d 851, 854 (1982). However, strict liability for a component manufacturer is limited when that component is integrated into a larger unit, thus, "[i]f the component part manufacturer does not take part in the design or assembly of the final system or product, he is not liable for defects in the final product if the component part itself is not defective." *Koonce v. Quaker Safety Prod. & Mfg.,* 798 F.2d 700, 715 (5th Cir.1986).

The undisputed facts in this case establish that DuPont is solely a bulk supplier of KEVLAR. Once DuPont supplies the fibers, they are then woven into ballistic fabrics according to the design specifications of the individual vest manufacturers. The KEV-

---

7. In an effort to demonstrate that the court should not apply a heeding presumption in this case, appellees argue that the risk of rifle fire was unknown, and therefore the Fifth Circuit Court of Appeals's opinion in *Thomas v. Hoffman–LaRoche, Inc.,* 949 F.2d 806 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2304, 119 L.Ed.2d 226 (1992), should guide our decision. In *Thomas,* the court recognized two types of warnings that might be associated with a particular product: "(1) an unavoidable risk warning; and (2) a preventable risk warning." *Id.* at 813.

The court applied the heeding presumption only to preventable risk warnings. Appellees contend that the risk of encountering high-caliber rifle fire was unknown and thus akin to an unavoidable risk. We believe, however, the risk of encountering rifle fire was known and therefore a preventable risk. Had appellees provided an adequate warning, Lt. House could have chosen to use his bullet proof vest safely thereby avoiding undue exposure to rifle fire. Thus, we do not find this case to be helpful to appellees.

LAR fibers are not, nor can they be, specifically labeled.

■ A bulk supplier of raw materials which are not themselves inherently dangerous has no duty to warn ultimate users of the manufactured product. *Veil v. Vitek, Inc.*, 803 F.Supp. 229, 234–37 (D.N.D.1992) (holding supplier of raw materials not inherently dangerous has no duty to warn ultimate consumer); *Higgins v. E.I. DuPont de Nemours, Inc.*, 671 F.Supp. 1055, 1061–62 (D.Md. 1987) (holding bulk supplier had no duty to warn ultimate consumers of dangers associated with final product); *see also Sara Lee Corp. v. Homasote Co.*, 719 F.Supp. 417, 422 (D.Md.1989) (holding bulk supplier of a dangerous product not liable for failing to warn ultimate consumer of product's danger).

Thus, DuPont had no duty nor opportunity to warn the ultimate vest user about the levels of protection afforded by vests woven from KEVLAR. We therefore affirm the trial court's grant of summary judgment in favor of appellee DuPont.

## IV. BREACH OF WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

■ Finally, Mrs. House asserts that material issues of fact existed as to whether appellee Lawco made, and breached, a warranty of fitness for a particular purpose. Lawco asserts that it did not sell Lt. House his vest for anything other than an "ordinary purpose"; that there was no evidence that Lt. House or the Department relied on Lawco's skill and judgment when purchasing the vest; and finally that Lt. House's vest was fit for the purpose for which it was purchased.

Pursuant to section 2–315 of the Uniform Commercial Code, an implied warranty of fitness for a particular purpose arises whenever "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."

Utah Code Ann. § 70A–2–315 (1990). In pertinent part, Official Comment 2 to Section 2–315 provides:

A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and goes to uses which are customarily made of the goods in question.

U.C.C. § 2–315 cmt. 2 (1983).

Before Lawco may be held liable for breach of an implied warranty, Mrs. House must establish that a disputed issue of material fact exists as to: (1) whether Lawco had knowledge of the particular purpose to which the goods were to be put; (2) whether there was reason for Lawco to know Lt. House relied upon its skill and judgment when selecting the Armour line of vests; and (3) whether Lt. House in fact relied on Lawco's skill and judgment. *See McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 66 (Wyo. 1989); James J. White & Robert S. Summers, *Uniform Commercial Code* § 9–9, at 358 (1984).

Mrs. House claims that there is sufficient evidence in the record for a jury to reasonably conclude Lawco knew of the Department's special needs and of the SWAT team's reliance upon Lawco's skill and judgment in selecting Lt. House's vest. In part, Mrs. House points to the testimony of Officer Karl Bartell that the Team explained their needs to all of the sales representatives they spoke with and, further, that "the guy that we bought the vests from" told them which vests to buy based upon those needs.[8]

In part, Officer Bartell testified:

He literally sold us on the vest as being the top of the line and best that money can buy. He said, "You know, what does your team need?" And we explained everything to him, what our team was going to be doing.... And he says, "Okay. There

---

8. At the time he testified, Officer Bartell was unclear whether the person they spoke with was a representative from Armour or Lawco. However, this evidence alone, notwithstanding Officer Bartell's confusion regarding the source, creates a material issue of fact sufficient to preclude the trial court's grant of summary judgment.

are several categories.... You want the best. You want the Cadillac of vests. You don't want this one, this one [is] down here on the line, you want the best." And we said, "Yes." And he says, ... "What is the most powerful weapon that you have to stop?" And we told him, "We have two 30.06s that the sniper squad has that we will need to stop." And then he says, "This vest, then, will do for the team members and you want this vest for whoever is the point man." And we at that time knew who our point man was, which was Fred. So Fred was measured and we bought the one vest for him that was supposed to stop that .06.

We conclude that this evidence creates an issue of fact as to whether Lawco gave Lt. House and his fellow officers a warranty of fitness for a particular purpose upon which the Department relied when it ultimately selected the bullet-resistant vests it purchased. We therefore reverse and remand this issue for trial.

## CONCLUSION

Viewing the disputed facts in this case in the light most favorable to Mrs. House, we find that a jury could reasonably conclude that appellees Armour and Lawco failed in their duty to warn Lt. House of the limitations and capabilities of his bullet-resistant vest thereby causing his death. Further, we conclude that a material issue of fact exists as to whether appellee Lawco gave a warranty of fitness for a particular purpose, upon which the Department relied when it purchased Lt. House's vest, and which was later breached when the vest failed to perform as warranted. Therefore, we reverse and remand these issues for trial.

With respect to Mrs. House's allegations regarding appellee DuPont, we hold that DuPont, a mere component manufacturer, had neither a duty nor an opportunity to warn Lt. House of the limitations and capabilities of his vest, and we therefore affirm the trial court's grant of summary judgment as to DuPont.

GREENWOOD and JACKSON, JJ., concur.