**2013 UT App 86**

# THE UTAH COURT OF APPEALS

MICAH RIGGS,

*Plaintiff, Appellant, and Cross-appellee*

*v.*

ASBESTOS CORPORATION LIMITED; *GEORGIA–PACIFIC, LLP; AND UNION CARBIDE CORPORATION*,

*Defendants, Appellees, and Cross-appellants.*

Opinion
No. 20110544-CA
Filed April 4, 2013

Third District, Salt Lake Department
The Honorable Glenn K. Iwasaki
No. 070911933

Alan R. Brayton, Gilbert L. Purcell, and Robert G. Gilchrist,
Attorneys for Appellant

Karra J. Porter, Sarah E. Spencer, and Katherine E. Venti,
Attorneys for Appellee Georgia–Pacific, LLP

E. Joshua Rosenkranz, Peter A. Bicks, Morton D. Dubin,
Rachel M. McKenzie, and Patricia W. Christensen,
Attorneys for Appellee Union Carbide Corporation

Julianne P. Blanch, Mark A. Behrens, and Cary Silverman,
Attorneys for Amici Curiae

JUDGE JAMES Z. DAVIS authored this Opinion,
in which JUDGES GREGORY K. ORME
and STEPHEN L. ROTH concurred.

DAVIS, Judge:

¶1 Micah Riggs, on behalf of his mother-in-law, the decedent Vickie Warren,[1] appeals the trial court's decision that the Comparative Negligence Act (CNA), and therefore joint and several liability, did not apply in this case. Defendant Union Carbide Corporation cross-appeals, arguing that its motion for judgment notwithstanding the verdict was wrongly denied because the raw material supplier rule shields Union Carbide from liability under the facts of this case. Alternatively, Union Carbide argues in its cross-appeal that there was insufficient evidence to support the jury's verdict that the unique type of asbestos it supplied medically caused Warren's illness. Defendant Georgia–Pacific, LLP also cross-appeals, challenging the sufficiency of the evidence identifying a particular Georgia–Pacific product at the various construction sites where Warren was exposed to asbestos. We affirm.

## BACKGROUND

¶2 "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict." *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 3, 82 P.3d 1064 (citation and internal quotation marks omitted). Warren was diagnosed with malignant peritoneal mesothelioma[2] in July 2007 and died as a result of the illness on May 25, 2010. Mesothelioma is a rare type of cancer that is closely linked to exposure to at least some types of asbestos. *See* WebMD, *Mesothelioma: Causes and Symptoms*, http://www.webmd.com/lung/mesothelioma-causes-and-symptoms (last visited March 29, 2013) ("Mesothelioma is a relatively rare form of cancer. . . . The main risk factor for mesothelioma is working with asbestos."). Shortly after Warren

---

1. For simplicity, we refer to the Appellant/Cross-Appellee as Warren, rather than Riggs.

2. Peritoneal mesothelioma affects the peritoneum, which is the membrane that lines the walls of the abdominal cavity. *See* Web MD, *Mesothelioma*, http://www.webmd.com/cancer/mesothelioma-11211 (last visited March 29, 2013).

was diagnosed, she filed suit on theories of strict liability and negligence against thirty-two defendants who manufactured, sold, distributed, or installed asbestos or asbestos-containing products. By the time of trial, however, only three defendants remained: Union Carbide, Georgia–Pacific, and Hamilton Materials.[3]

¶3    Georgia–Pacific's involvement in this case arises from its role as a manufacturer and consumer-side supplier of asbestos-containing tape joint compound that was used at various residential construction sites where Warren helped her father from 1958 through 1977 and in the construction of Warren's own home in 1977.[4] Union Carbide intermittently supplied the raw asbestos, a unique variety called Calidria,[5] that was used by Georgia–Pacific in the manufacturing of its tape joint compound between 1970 and 1977.

¶4    "On the eve of trial," during a pretrial conference with all of the parties, Warren argued for the first time that the CNA, rather than the Liability Reform Act (LRA) that the parties had been proceeding under for the entire three years since the filing of the case, ought to apply because it was in effect at the time of Warren's

---

3. Hamilton Materials is not a party to this appeal.

4. As the Defendants explain, "[j]oint compound is an adhesive that performs several functions in construction work, including attaching the joint tape placed over seams between sheets of drywall and concealing nail heads." If joint compound is applied to surfaces that are "to be 'finished' (in the construction sense), it is sanded so that the area will present a smooth surface for painting." As concerns these defendants, Warren was exposed to asbestos when she inhaled the dust produced from sanding tape joint compound at the various construction sites where she was present from 1958 to 1977.

5. Union Carbide explains in its appellate brief that the term "'asbestos' covers a family of naturally occurring silicate minerals with a fibrous structure."

exposure to Defendants' asbestos and asbestos-containing products. The trial court rejected Warren's argument, determining that the LRA applies both because Warren did not have a cause of action until she was diagnosed with mesothelioma and because her argument was untimely.

¶5      A jury trial was held in April and May 2010, at the conclusion of which both Georgia–Pacific and Union Carbide moved for a directed verdict, arguing, among other things, that Warren failed to prove that her illness was medically caused by their products. The trial court denied the directed verdict motions, noting, "[T]his is the most fact-intensive and expert-intensive trial that I've ever presided upon, and the issues will remain for jury determination . . . ."

¶6      The jury reached its verdict on May 12, 2010, awarding Warren $5,256,818.61 in economic and non-economic damages. The jury, having been instructed to apportion fault in accordance with the LRA, determined that Georgia–Pacific was 5% at fault and Union Carbide 20% at fault.[6]

¶7      Almost one year later, Union Carbide moved for judgment notwithstanding the verdict (the JNOV motion), reasserting an argument that it first made in its pretrial motion for summary judgment—that it could not be held liable for Warren's illness because it is a bulk supplier of raw materials, as described in the Third Restatement of Torts. *See* Restatement (Third) of Torts: Products Liability § 5 & cmt. c (1998). The trial court had rejected this argument when it denied Union Carbide's motion for summary judgment, reasoning that "Utah has not considered the issue of adopting the Restatement (Third) of Torts: Products Liability § 5 and, indeed, recent Utah case law supports the conclusion that with respect to the specific provision at issue . . . , the Restatement (Second) of Torts should act as the guide," and the court ultimately declined to walk through the application of either

---

6. Hamilton Materials and other parties not relevant to this appeal were apportioned 12% and 63% of the fault respectively.

restatement because doing so involved disputed issues of material fact. Despite this ruling, and without any objections, Union Carbide referenced bulk-supplier principles in a manner that implied it was a defense against liability several times in its opening statement at trial, stating,

> Union Carbide is a raw materials supplier. They mined and milled asbestos and they put it in bags. . . . And they sold this asbestos to manufacturers.
>
> The manufacturers then decided what to do with the asbestos, whether to use it, how much to use, what to mix it with, how to package it, and what to put on those packages.
>
> . . . .
>
> . . . Union Carbide didn't sell a bag of asbestos to Ms. Warren. . . .
>
> Once that asbestos is packaged, . . . [and sent] to a distributor[,] Union Carbide is no[ longer] involved. . . . That's not Union Carbide's area of responsibility. It's almost like taking a baton in a relay race[ in that] Union Carbide starts out with the raw fiber, . . . [and] passes [it] on . . . [to] a distributor, [who mixes and repackages it and has its own] . . . areas of responsibility.
>
> . . . Union Carbide takes responsibility for where it fits into this whole process.

The issue was raised again at a hearing on jury instructions, during which Union Carbide noted, "[W]e would concede that [the court] has ruled on the [bulk supplier argument] and we are asserting it simply for the record . . . ." Union Carbide raised this argument a final time during trial in closing argument, by asking the jury to "[r]emember [it was] a raw supplier" and, as such, had the ability

to warn only its direct customers about the dangers of asbestos because "when [it] put a warning on a bag, that bag goes to a manufacturer and that bag is gone."

¶8     Union Carbide's JNOV motion renewed this argument, relying on the Utah Supreme Court's explicit adoption of most of section 5 of the Third Restatement of Torts in a case that was issued two days after the jury reached its verdict in Warren's case. *See Gudmundson v. Del Ozone*, 2010 UT 33, ¶¶ 55–61, 232 P.3d 1059 ("Because we find [section 5's] policy-based rationale persuasive, we adopt this section of the Third Restatement."). The trial court, however, denied the JNOV motion without explicitly addressing the raw material supplier argument, noting simply that there was sufficient evidence to support the jury's verdict. All three parties—Warren, Union Carbide, and Georgia–Pacific—now appeal.

ISSUES AND STANDARDS OF REVIEW

¶9     Warren asserts that the trial court erroneously applied the LRA instead of the CNA. This presents a question of law, which we review for correctness. *Jedrziewski v. Smith*, 2005 UT 85, ¶¶ 3–4, 128 P.3d 1146 (considering, as a matter of law, whether the LRA or CNA should apply).

¶10     Union Carbide argues on cross-appeal that the bulk supplier rule exempts it from liability. We interpret this as an appeal from the denial of its JNOV motion. Union Carbide also asserts that its directed verdict and JNOV motions were wrongly denied because Warren presented insufficient evidence of medical causation to support the jury's verdict.[7] A motion for judgment notwithstanding

---

7. We assume Union Carbide raises the bulk supplier issue as an appeal from the denial of its JNOV motion, as it does for its causation argument. In laying out its bulk supplier argument on appeal, Union Carbide references its summary judgment, directed

(continued...)

the verdict or a motion for a directed verdict should be granted when the moving party is entitled to judgment as a matter of law. *See Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467 (directed verdict standard); *Hansen v. Stewart*, 761 P.2d 14, 17 (Utah 1988) (judgment notwithstanding the verdict standard). Thus, we review a trial court's denial of either motion for correctness. *See Lyon v. Burton*, 2000 UT 19, ¶ 11, 5 P.3d 616 (judgment notwithstanding the verdict); *Rose v. Provo City*, 2003 UT App 77, ¶ 7, 67 P.3d 1017 (directed verdict).

¶11    Georgia–Pacific also cross-appeals, arguing that its directed verdict motion was wrongly denied because the jury's verdict was not supported by sufficient evidence as to the identification of its tape joint compound at any of the locations where Warren was exposed to asbestos-containing tape joint compound. We review the trial court's denial of a motion for directed verdict considering "the evidence and all reasonable inferences that may fairly be

---

7. (...continued)
verdict, and JNOV motions to demonstrate that the argument was preserved, without stating from which denial it is appealing. Because Union Carbide's summary judgment motion was denied on November 9, 2009, and its directed verdict motion was denied on May 7, 2010—both before *Gudmundson* was issued on May 14, 2010—it does not appear that Union Carbide intended to nonetheless appeal the denial of these two motions based on the applicability of the bulk supplier rule when this rule was not explicitly part of Utah law at the time those motions were denied. *See generally Gudmundson v. Del Ozone,* 2010 UT 33, ¶¶ 53–61, 232 P.3d 1059. To the extent that Union Carbide may have intended to appeal the denial of those two motions, in addition to those motions predating *Gudmundson,* there remained material issues of fact in dispute to justify the trial court's rulings. Likewise, to the extent Union Carbide seeks review of the trial court's denial of its proposed "sophisticated user" jury instruction, we decline to address the matter for lack of adequate briefing. *See generally* Utah R. App. P. 24(a)(9) (describing the components of an adequately briefed argument).

drawn therefrom in the light most favorable to the party moved against, and will sustain the denial if reasonable minds could disagree with the ground asserted for directing a verdict." *Mahmood v. Ross*, 1999 UT 104, ¶ 16, 990 P.2d 933 (citation and internal quotation marks omitted). In other words, "[t]his Court's standard of review of a directed verdict is the same as that imposed upon the trial court": "we review the trial court's decision to determine if the evidence at trial raised a question of material fact which precluded judgment as a matter of law." *Id.* (alteration in original) (citation and internal quotation marks omitted).

## ANALYSIS

### I. Applicability of the LRA

¶12    Warren argues that the LRA was wrongly applied because her cause of action arose when she was exposed to asbestos, not when she was diagnosed with mesothelioma.[8] The trial court disagreed, concluding that Warren's claim did not accrue until she was diagnosed with mesothelioma and that the LRA applies because it was the law in effect at that time. We agree with the trial court.

¶13    "The general rule is that the law establishing substantive rights and liabilities when a cause of action arises, and not a subsequently enacted statute, governs the resolution of the dispute." *Carlucci v. Utah State Indus. Comm'n*, 725 P.2d 1335, 1336 (Utah 1986). Likewise, "[t]he courts of this state operate under a statutory bar against the retroactive application of newly codified laws," unless the newly enacted statute indicates that it is to be retroactive, *State v. Clark*, 2011 UT 23, ¶ 11, 251 P.3d 829; *see also* Utah Code Ann. § 68-3-3 (LexisNexis 2011) ("A provision of the Utah Code is not retroactive, unless the provision is expressly

---

8. Warren also argues that the trial court erroneously rejected her motion as untimely. Because of the manner in which we resolve this issue, we need not address the question of timeliness.

declared to be retroactive."), or the "statutory amendments are procedural, rather than substantive," *State v. Burgess*, 870 P.2d 276, 280 n.6 (Utah Ct. App. 1994). The issue before us is not one of statutory interpretation, as Warren asserts, but a question of when Warren's claim arose.[9]

¶14    "A tort cause of action accrues when it becomes remediable in the courts, that is, when all elements of a cause of action come into being." *Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*, 794 P.2d 11, 19 (Utah 1990); *cf. Sevy v. Security Title Co. of S. Utah*, 902 P.2d 629, 634 (Utah 1995) ("The general rule regarding statutes of limitations is that the limitation period begins to run when the last event necessary to complete the cause of action occurs."). In other words, "the law does not recognize an inchoate wrong, and . . . until there is actual loss or damage resulting to the interests of another, a claim for negligence is not actionable." *Seale v. Gowans*, 923 P.2d 1361, 1364 (Utah 1996) (citation and internal quotation marks omitted). The injury necessary to pursue any tort action must be a "legal injury" in that there needs to be a remediable injury and "the injury [must have been] caused by negligent action." *Id.* at 1363 (citation and internal quotation marks omitted). Accordingly, "even though there exists a possibility, even a probability, of future harm, it is not enough to sustain a claim, and a plaintiff must wait until some harm manifests itself." *Id.* at 1364–65 (holding "that damages in the form of an enhanced risk" are insufficient to sustain a cause of action); *see also Johnson v.*

_____

9. We note that the determination of which statute applies has a major impact on all parties in that the CNA permitted joint and several liability, while the LRA renders a defendant liable for only the proportion of the damages that is commensurate with the proportion of its fault. *See Stephens v. Henderson*, 741 P.2d 952, 953 (Utah 1987) (explaining that the CNA "provided for joint and several liability, that is, each defendant was liable to the plaintiff for the full amount of the plaintiff's damages," but that it was repealed and replaced with the LRA in 1986). *Compare* Utah Code Ann. §§ 78B-5-817 to -820 (LexisNexis 2012), *with id.* §§ 78-27-37 to -43 (Michie 1985).

*Mullee*, 385 So. 2d 1038, 1040 (Fla. Dist. Ct. App. 1980) (holding that a patient's malpractice cause of action did not accrue "when the patient first learned of the misdiagnosis, [because] there was no evidence that the alleged negligence 'had resulted in any harm to her'" and treatment for her cancer could still be successful despite the misdiagnosis, leaving her where she would have been if the misdiagnosis did not occur and the cancer had been detected during the previous year's mammogram (cited by *Seale*, 923 P.2d at 1365)).

¶15    Here, Warren argues that her claim accrued "long before" the LRA became effective because her "initial injury" was the cell damage and scarring that resulted from inhaling Defendants' asbestos. We disagree. Regardless of whether the replication of those damaged cells over time produced Warren's cancer, *see infra* ¶¶ 27-28, she nonetheless did not have an actionable claim until she was diagnosed with mesothelioma. Until then, Warren's development of mesothelioma was only a possibility in light of her exposure to asbestos. Indeed, it is the same possibility that any of her family members, who also worked alongside Warren at the same construction sites during the same period of time, could have developed an asbestos-related illness. *See Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 978–79 (Utah 1993) (determining in an asbestos case that "[m]ere exposure to an allegedly harmful substance . . . is not enough for recovery" because "the plaintiff is not harmed until the onset of the actual illness"). Accordingly, because Warren's cause of action did not accrue until her diagnosis in July 2007, long after the repeal of the CNA and enactment of the LRA, we affirm the trial court's application of the LRA.

## II. The Raw Materials Supplier Rule

¶16    Union Carbide argues on cross-appeal that its JNOV motion was incorrectly denied because under the Third Restatement of Torts, "a raw material supplier . . . cannot be held liable for injuries to end users of tape joint compound." The trial court denied the JNOV motion without explicitly addressing this argument, noting simply that there was sufficient evidence to support the jury's verdict.

¶17 Generally, "[t]rial courts may grant a j.n.o.v. only when the losing party is entitled to judgment as a matter of law. Accordingly, we will affirm a j.n.o.v. only when the evidence is insufficient as a matter of law to support the jury's verdict." *Walker v. Parish Chem. Co.*, 914 P.2d 1157, 1160 (Utah Ct. App. 1996) (citation omitted).

¶18 Two days after the jury reached its verdict in this case, our supreme court, in *Gudmundson v. Del Ozone*, 2010 UT 33, 232 P.3d 1059, adopted the rule in the Third Restatement of Torts on which Union Carbide now relies.[10] *See id.* ¶¶ 55–56. *Gudmundson* adopted the rule as follows:

> "One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> . . .
>
> > (b)(1) the seller or distributor of the component substantially participates in the

---

10. Although *Gudmundson* is discussed extensively in their briefs, the parties have not addressed whether this decision ought to be applied retroactively in this case. *See generally Merrill v. Utah Labor Comm'n*, 2009 UT 74, ¶ 5, 223 P.3d 1099 ("The general rule from time immemorial is that the ruling of a court is deemed to state the true nature of the law both retrospectively and prospectively. In civil cases, however, the court may, in its equitable discretion, prohibit or limit retroactive operation of its ruling where the overruled law has been justifiably relied upon or where retroactive operation creates a burden." (citations and internal quotation marks omitted)); *Van Dyke v. Chappell*, 818 P.2d 1023, 1024–26 (Utah 1991) (applying retroactively a case decided one year after the trial). Accordingly, we assume that the parties have no objection to the retroactive application of *Gudmundson*.

> integration of the component into the design of the product; and
> (2) the integration of the component causes the product to be defective, as defined in [the Restatement]; and
> (3) the defect in the product causes the harm."

*Id.* ¶ 55 (quoting Restatement (Third) of Torts: Products Liability § 5 (1998)); *see also id.* ¶ 55 n.14 (declining to adopt subsection (a) of the Restatement provision at issue because "it only addresses situations in which the component part itself is defective" and those situations are already "adequately addressed in our case law"). The supreme court explained that this new rule "embraces the policy-based rationale that although manufacturers of nondefective component parts at the time of sale should not bear the risk of ensuring the integrated product's safety, a component manufacturer who participates in the design of the product should bear some liability risk." *Id.* ¶ 56; *accord* Restatement (Third) of Torts: Products Liability § 5 cmt. a.

¶19     The rule defines "[p]roduct components" as "raw materials, bulk products, and other constituent products sold for integration into other products." Restatement (Third) of Torts: Products Liability § 5 cmt. a. Liability for a nondefective product under the rule "requires two findings. First, the participation [by the component supplier in integrating the component into the final product] must be substantial. Second, the integration of the nondefective component must cause the integrated product to be defective." *Gudmundson,* 2010 UT 33, ¶ 57. The first requirement "ensures that '[m]ere suppliers [will not be] expected to guarantee the safety of other manufacturers' [products],'" *id.* ¶ 59 (first alteration in original) (quoting *Crossfield v. Quality Control Equip. Co.,* 1 F.3d 701, 704 (8th Cir. 1993)), and also "prevents the imposition [on uninvolved component parts suppliers] of a duty to 'foresee all the dangers that may result from the use of a final product which contains its component part or materials,'" *id.* ¶ 58 (quoting *Bond v. E.I. Du Pont De Nemours & Co.,* 868 P.2d 1114, 1119 (Colo. Ct. App. 1993)). *See House v. Armour of Am., Inc.,* 886 P.2d 542, 553 (Utah Ct. App. 1994) ("'[I]f the component part

manufacturer does not take part in the design or assembly of the final system or product, he is not liable for defects in the final product if the component part itself is not defective.'" (quoting *Koonce v. Quaker Safety Prods. & Mfg. Co.*, 798 F.2d 700, 715 (5th Cir. 1986))), *aff'd*, 929 P.2d 340 (Utah 1996); *accord Buonanno v. Colmar Belting Co., Inc.*, 733 A.2d 712, 719 (R.I. 1999).

¶20    In applying the *Gudmundson* rule to this case, the first step is to determine whether Union Carbide's product, Calidria, was defective; the bulk supplier defense is available only to supplier's of nondefective products. "Utah law recognizes three types of product defects: design defects, manufacturing flaws, and inadequate warnings regarding use." *House*, 886 P.2d at 547. For liability to be imposed, the defect identified must be shown to have made "the product . . . unreasonably dangerous to the user or consumer at the time it was sold by the manufacturer or other initial seller." *Niemela v. Imperial Mfg., Inc.*, 2011 UT App 333, ¶ 9, 263 P.3d 1191 (citing Utah Code Ann. § 78B-6-703 (2008) (current version at Utah Code Ann. § 78B-6-703 (LexisNexis 2012)) (Utah Product Liability Act)). "[U]nreasonably dangerous" is defined in terms of what would be "'beyond [the danger] . . . contemplated by the ordinary and prudent buyer, consumer, or user of that product.'" *Id.* (quoting Utah Code Ann. § 78B-6-702 (2008) (current version at Utah Code Ann. § 78B-6-702 (LexisNexis 2012)).

¶21    Here, Warren argues that the hazards posed by raw asbestos, in general, render asbestos innately defective. We disagree with this "dangerous equals defective" argument and determine that, regardless of its dangerousness, Union Carbide's product could not be defectively designed or manufactured because it is a raw, unadulterated material.[11] *See* Restatement

---

11. Warren insists that Calidria was "manufactured" based on one Union Carbide witness whose testimony stated that the company "manufactured different grades of asbestos fiber" by essentially cleaning the raw fibers to varying levels of purity. (Emphasis omitted.) However, Warren has not asserted that this process was

(continued...)

(Third) of Torts: Products Liability § 5 cmt. c ("[A] basic raw material . . . cannot be defectively designed."); *see also Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 331 (5th Cir. 1998) (noting that raw, unadulterated, chrysotile asbestos, of which Calidria is a type, is not itself defective); *Kurrack v. American Dist. Tel. Co.,* 625 N.E.2d 675, 681 (Ill. App. Ct. 1993) (rejecting the plaintiff's request that the jury be instructed "that the insulating material was unreasonably unsafe merely because it contained asbestos").

¶22    Thus, the question boils down to whether Calidria was defective based on the adequacy of the warnings provided. Implicit in evaluating whether a warning was defective is the need to identify "the ordinary and prudent buyer, consumer, or user of that product" to whom the notice was due. *See Niemela,* 2011 UT App 333, ¶ 9 (citation and internal quotation marks omitted). Here, there are two products—raw Calidria and tape joint compound—and two different types of users—companies like Georgia–Pacific using the raw asbestos, and consumers like Warren using the tape joint compound. Additionally, *Gudmundson,* and even before *Gudmundson, House v. Armour of America, Inc.,* 886 P.2d 542 (Utah Ct. App. 1994), *aff'd,* 929 P.2d 340 (Utah 1996), explain that the mere presence of a nondefective component in a final product does not impose upon the component supplier the duty to warn end users of the final product's potential dangers. *See Gudmundson,* 2010 UT 33, ¶¶ 58–59; *House,* 886 P.2d at 553; *see also Hoffman v. Houghton Chem. Corp.,* 751 N.E.2d 848, 854, 856–57 (Mass. 2001) (recognizing that because "any label warnings provided to the intermediary [by the bulk supplier] would be unlikely to reach the end user" and "the bulk product [often] has multitudinous commercial uses," the imposition "on bulk suppliers [of] a duty to warn all foreseeable

---

11. (...continued)
conducted defectively or that it somehow made the raw asbestos "unreasonably dangerous" beyond its inherent qualities. *Cf. Bishop v. GenTec Inc.,* 2002 UT 36, ¶ 25, 48 P.3d 218 ("[P]roof of a defect under a negligent manufacture theory will necessitate proof that the defective condition of the product was the result of negligence in the manufacturing process . . . .").

end users *directly* . . . would be unduly, indeed crushingly, burdensome," and ultimately contrary to "[t]he goal of products liability law[, which] is to induce conduct that is capable of being performed"; concluding that the best way to advance this goal and equitably "balance[] the realities of [a bulk supplier's] business with the need for consumer safety" is to "permit[] a bulk supplier to satisfy its duty to warn by reasonable reliance on an intermediary who understands the product's risks and is able to pass on to end users warnings about the product's hazards"; and noting that the bulk supplier rule is "separate[ and] conceptually discrete" from the sophisticated user doctrine (citation and internal quotation marks omitted)); *cf. In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F. Supp. 1463, 1467–68 (N.D. Ala. 1995) (citing *House* favorably and noting that "those selecting the [integrated] product for their specific application," have a "more direct responsibility" to warn the product's end users); *Coffey v. Chemical Specialties, Inc.*, 4 F.3d 984, 1993 WL 318886, at *3 (4th Cir. 1993) (interpreting the Restatement (Second) of Torts' bulk supplier rule as recognizing "that in certain circumstances, a bulk supplier of a dangerous product may satisfy its reasonable care requirements by notifying the purchaser . . . of the dangers of the product rather than directly notifying the ultimate users . . . of the product").

¶23 Which individuals Union Carbide owed a duty to warn, and whether its warnings to Georgia–Pacific satisfied that duty, are questions that were not addressed or developed at trial in such a way as to permit our review, especially under the constraints of the JNOV framework. Union Carbide presented testimonial and documentary evidence regarding the warnings it provided to Georgia–Pacific,[12] but the jury was not specifically instructed to

_____

12. Union Carbide's evidence indicates that it began placing warnings on the packaging for Calidria starting in June 1968, which was four years before such warnings were federally mandated. The 1968 warning read, "WARNING: BREATHING DUST MAY BE HARMFUL DO NOT BREATHE DUST." After the warnings were mandated, Union Carbide updated the language of the warning to

(continued...)

review Union Carbide's duty to warn in a manner that identified, or asked the jury to identify, the individuals to whom Union Carbide owed its duty to warn—Georgia–Pacific as a user of raw asbestos, Warren as a user of tape joint compound, or both. Rather, the warning instructions are worded in terms of "foreseeable" uses: as to the products liability claims, the jury was instructed to review the adequacy of the warning from the perspective of the "members of the community who use a product" and, as to the negligence claims, to evaluate the warning from the perspective of what "a reasonable user would not expect" in terms of the product's dangers. The jury was also instructed that "[i]f the event that produced the injury would have occurred regardless of the defendant's conduct, then the failure to provide a warning is not the proximate cause of the harm and the plaintiff's claim must fail." Likewise, Union Carbide proposed jury instructions that seemed to obscure the issue of who might be owed any warning, framing the warning analysis in terms of the "knowledge common to members of the community who use the product."

---

12. (...continued)
read, "CAUTION Contains Asbestos Fibers Avoid Creating Dust Breathing Asbestos Dust May Cause Serious Bodily Harm," and also provided an "Asbestos Toxicology Report" to customers that explained the potential health risks of asbestos inhalation and recommended different control methods to make working with asbestos safer. The report was revised regularly to stay current with developments in the understanding of asbestos's effect on the body. The revised reports pointed out the association between asbestos and mesothelioma and recommended that people "wear respirators where dusting occurs in finishing products such as sanding taped joints." (Internal quotation marks omitted.) Union Carbide also offered its assistance to its customers to conduct dust counts in their facilities to determine "what the level of airborne asbestos was," and provided its customers with an index of asbestos regulations and scientific and medical literature regarding the potential health risks associated with asbestos.

¶24    Additionally, Warren did not address at trial whether Union Carbide's duty to warn applied exclusively to Georgia–Pacific or extended to Warren and, to an extent, had little reason to do so in light of the trial court's earlier ruling rejecting the application of the bulk supplier rule and the generalities used by Union Carbide in its pretrial proposed jury instructions. Thus, we find ourselves in the peculiar procedural position of reviewing a denial of a judgment notwithstanding the jury's verdict, when the issue at hand, while persuasive at an abstract level, was not presented to the jury and therefore not a part of its verdict. Because we are constrained by the JNOV standard, we must affirm the trial court's determination. Thus, Union Carbide has demonstrated that the bulk supplier rule generally applies in cases like this one but has failed to show that the evidence before the jury requires a conclusion, as a matter of law, that it had fulfilled whatever duty to warn it had under the circumstances, even if that duty extended only to Georgia–Pacific and not to Warren.[13]

## III. Sufficiency of the Evidence

¶25    Last, we address Union Carbide's and Georgia–Pacific's cross-appeals, challenging the sufficiency of the evidence supporting the jury's verdict. We address each party's arguments in turn.

---

13. Had Union Carbide filed a motion for a new trial and appealed from the denial of that, we would have been able to apply a broader standard of review. *See supra* ¶ 10 n.7. *Compare Walker v. Parish Chem. Co.*, 914 P.2d 1157, 1160 (Utah Ct. App. 1996) ("Trial courts may grant a j.n.o.v. only when the losing party is entitled to judgment as a matter of law. Accordingly, we will affirm a j.n.o.v. only when the evidence is insufficient as a matter of law to support the jury's verdict."(citation omitted)), *with* Utah R. Civ. P. 59(a) (including insufficient evidence to support the verdict as just one of several grounds on which a motion for a new trial can be granted).

A. Union Carbide's Challenge to the Sufficiency of the Evidence

¶26    Union Carbide's insufficiency argument is framed as an appeal from the trial court's denial of its directed verdict and JNOV motions. We review both denials for correctness and will reverse "when the evidence is insufficient as a matter of law to support" a verdict against the moving party. *See Walker v. Parish Chem. Co.*, 914 P.2d 1157, 1160 (Utah Ct. App. 1996) (judgment notwithstanding the verdict standard); *accord Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467 (directed verdict standard). Additionally, to the extent the analysis involves conflicting testimony and evidence, "[w]e give deference to the [jury] . . . because it stands in a superior position from which to evaluate and weigh the evidence and assess the credibility and accuracy of witnesses' recollections." *Drake v. Industrial Comm'n*, 939 P.2d 177, 181 (Utah 1997).

¶27    Union Carbide argues that Warren failed to prove that "Calidria . . . causes peritoneal mesothelioma" in general and that Calidria "more probably than not . . . was a substantial factor in causing her peritoneal mesothelioma." In support of this argument, Union Carbide claims that Warren's lead medical expert, Dr. Samuel Hammar, admitted that his causation testimony was based on an "'unproven hypothesis.'" This argument revolves around Dr. Hammar's testimony that mesothelioma is a dose-response disease—meaning the more exposures a person has to asbestos, the more likely they are to develop mesothelioma. Union Carbide's description of Dr. Hammar's conclusion, however, is taken out of context; Dr. Hammar's answer to Union Carbide's question at trial as to whether this dose-response theory was an unproven hypothesis is more nuanced than Union Carbide acknowledges. Dr. Hammar actually stated, "[W]ith respect to [Union Carbide's] question about [whether] 'that's an unproven hypothesis,' I think, in a way, it is proven." Dr. Hammar further explained that although the dose-response hypothesis itself may not be the subject of a research paper, textbook, or study, it is nonetheless a fundamental understanding in the medical community as to how cancer develops. He testified that Union Carbide's framing of the question misrepresented the issue in that the dose-response hypothesis may never be definitively "proven" because to do so

would require "actually look[ing] inside of a person's pleura . . . [to] see what kind of changes are happening at a given time . . . [and] get[ting] multiple biopsies" to run genetic tests over a period of "many years" before seeing "the development of a single cancer cell." That it cannot be proven either way, Dr. Hammar testified, is not evidence that the theory is incorrect.

¶28 Union Carbide also claims that Dr. Hammar stated that he did not know whether there was any evidence that Calidria could have caused Warren's disease and that he agreed there was no evidence that Calidria could cause mesothelioma in general. This summary of Dr. Hammar's testimony is also taken out of context. Although Dr. Hammar testified that he believed there was not yet "a documented case that Calidria has caused mesothelioma," he qualified his answer by explaining "that [there are no documented cases in which] . . . the only asbestos [mesothelioma patients] were exposed to was the Calidria chrysotile asbestos." In addition, Dr. Hammar testified that because mesothelioma is a dose-response disease, there is no way "to go back in a specific person's work history who gets mesothelioma" and pinpoint a particular exposure as the cause, especially because "[a]ll types of asbestos can cause mesothelioma" and "most of the people that have been exposed to asbestos have been exposed to more than one type," with the "combination of chrysotile and amphiboles . . . produc[ing] the most cases of mesothelioma." This concept is well documented in the medical literature, according to Dr. Hammar, and supported by Warren's other expert medical witness as well as at least one of Union Carbide's expert medical witnesses, who also was involved in publishing a study that claimed that all types of asbestos cause mesothelioma, i.e. "every fiber hurts."[14] Thus, Union

---

14. Union Carbide directs our attention to other jurisdictions that have rejected various applications of this "every fiber hurts" theory. What occurred in these cases, however, was not blanket rejections of the "every fiber hurts" theory. *See, e.g., Boyd v. Celotex Corp.*, 951 F.2d 348, 1991 WL 278967, at *3–4 (6th Cir. 1991) (rejecting the defendant's contention "that the overwhelming

(continued...)

Carbide's own expert witness refutes its assertion on appeal that no evidence was presented at trial that chrysotile asbestos, in general, can cause mesothelioma. Further, Union Carbide's evidence of the warnings it gave to its employees and customers about the hazards and carcinogenic properties of its asbestos seemingly contradict its claim that there was no basis to determine that Calidria, specifically, was dangerous. Thus, Warren presented sufficient evidence that Calidria, in general, can cause peritoneal mesothelioma.

¶29    Last, Dr. Hammar's testimony that he could not say that Calidria alone caused Warren's mesothelioma was given in the context of his explanation that because Warren, like most people, was exposed to more than one type of asbestos, it is impossible to single out any one type of asbestos as the stand-alone cause of her disease. And here, Warren did not need to provide evidence that Calidria was the sole cause of her illness but only that it was a substantial factor. Dr. Hammar testified that chrysotile asbestos, and, more specifically, Warren's exposures to tape joint compound dust, caused Warren's mesothelioma, necessarily leading to the

---

14. (...continued)
weight of evidence . . . [demonstrates] that exposure to chrysotile asbestos does not cause peritoneal mesothelioma" and that "[t]he jury verdict was therefore based on bad science," because the "defendant fail[ed] . . . to demonstrate why the evidence presented on this issue was beyond the purview of the jury" or explain how the defendant's expert witness's contrary testimony invalidated the plaintiff's evidence (internal quotation marks omitted)); *Bartel v. John Crane, Inc.*, 316 F. Supp. 2d 603, 604–05, 610–11 (N.D. Ohio 2004) (rejecting the plaintiff's negligent failure to warn claim because the plaintiff demonstrated only infrequent and background level exposures to asbestos, and as a result, also rejecting plaintiff's "every fiber hurts" evidence as too general in light of the plaintiff's failure to prove exposure and because it amounted to a strict liability standard not applicable in this case under Sixth Circuit precedent), *aff'd sub nom.*, *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488 (6th Cir. 2005).

conclusion that Calidria contributed to her illness because Calidria is the type of chrysotile asbestos contained in the tape joint compound at issue. Dr. Hammar based that conclusion on his research demonstrating that chrysotile asbestos has "a tendency to damage . . . cells and make changes in . . . cells more than the other types of asbestos" as well as a greater likelihood of "translocat[ing] from the lung . . . to the [peritoneum]." Warren's other medical expert witness agreed, explaining that Calidria, specifically, can cause the cell damage that leads to mesothelioma. Accordingly, Warren presented sufficient evidence for the jury to determine that Calidria was a substantial factor in causing her illness. Though Union Carbide presented evidence to the contrary and attempted to discredit and refute Warren's evidence, "this criticism does not conclusively prove the invalidity of" Warren's evidence, *see Boyd v. Celotex Corp.*, 951 F.2d 348, 1991 WL 278967, at *3 (6th Cir. 1991); a determination of what weight to assign conflicting evidence is the responsibility of the jury, not the judge.[15] Accordingly, the trial court did not err when it denied Union Carbide's directed verdict and JNOV motions.

B. Georgia–Pacific's Challenge to the Sufficiency of the Evidence

¶30 On cross-appeal, Georgia–Pacific challenges the trial court's denial of its motion for directed verdict, arguing that Warren produced insufficient evidence to prove that she was actually exposed to its brand of tape joint compound. Georgia–Pacific

---

15. Because we determine that Dr. Hammar's testimony and the evidence regarding Warren's exposures to tape joint compound dust containing Calidria are sufficient to support the jury's verdict, we do not address Union Carbide's challenges to Warren's other causation evidence. Additionally, Union Carbide's causation challenges are arguably not properly marshaled. *See generally Hansen v. Stewart*, 761 P.2d 14, 17–18 (Utah 1988) (explaining that a party challenging the sufficiency of the evidence "must marshal all the evidence supporting the verdict and then show that the evidence cannot support the verdict" (citation and internal quotation marks omitted)).

claims that the evidence Warren presented was "speculation" and "showed nothing more than the occasional presence of Georgia–Pacific joint compound at unspecified times at unspecified work sites." The trial court denied Georgia–Pacific's directed verdict motion, stating, "[T]his is the most fact-intensive and expert-intensive trial that I've ever presided upon, and the issues will remain for jury determination . . . ."

¶31    "This [c]ourt's standard of review of a directed verdict is the same as that imposed upon the trial court." *Mahmood v. Ross*, 1999 UT 104, ¶ 16, 990 P.2d 933 (citation and internal quotation marks omitted). "A trial court is justified in granting a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Merino v. Albertsons, Inc.*, 1999 UT 14, ¶ 3, 975 P.2d 467. Accordingly, "[t]o demonstrate that the evidence is insufficient to support the jury verdict, the one challenging the verdict must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict." *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 799 (Utah 1991).

¶32    Here, Georgia–Pacific contends that Warren's evidence failed to sufficiently identify its tape joint compound as being used, not just present, at any particular work site where Warren was exposed to asbestos from tape joint compound dust and that, as a result, she failed to show that Georgia–Pacific's product was a cause of her illness. The jury instructions explained that for the different claims Warren alleged, causation hinged on determining whether Warren's "exposure to a particular defendant's asbestos or asbestos-containing product," a defect in the design of a defendant's product, or a defendant's lack of adequate warning were, individually, substantial factors behind Warren's having developed peritoneal mesothelioma. Georgia–Pacific marshals the evidence[16] as follows: Warren's brother-in-law testified that he

---

16. We disagree with Warren's argument that Georgia–Pacific

(continued...)

remembered carrying boxes of tape joint compound into a duplex project that Warren's family was working on and into Warren's home while it was being built and that he believed those boxes of tape joint compound were probably from Georgia–Pacific. Warren's younger brother, who also started helping at their father's construction sites as a child, testified that Georgia–Pacific's tape joint compound was used at approximately 20% of his father's construction projects; he described the packaging for Georgia–Pacific tape joint compound as a white cardboard box with "GP" printed on it and "Georgia–Pacific" written below that in smaller letters; he identified two specific duplex projects where he recalled Georgia–Pacific tape joint compound being used; and he testified that Warren visited the duplex sites during construction from time to time and was there to help with cleanup after the drywall work was finished.

¶33 Although not reflected in the quoted record excerpts in Georgia–Pacific's brief, the record pages that Georgia–Pacific cites also indicate that the descriptions Warren's brother and brother-in-law gave of Georgia–Pacific's tape joint compound packaging were nearly identical—both described the packaging as twelve-inch-by-twelve-inch white boxes with plastic lining on the inside—which lends credence to both of their testimonies. Additionally, both witnesses indicated that Georgia–Pacific's tape joint compound was used during the construction of at least one of the duplex projects, and both testified that Warren helped with cleanup work at the duplex projects. Warren's brother specifically remembered

---

16. (...continued)
failed to meet its marshaling burden. *See generally West Valley City v. Majestic Inv. Co*, 818 P.2d 1311, 1315 (Utah Ct. App. 1991) (explaining the marshaling requirement). The favorable evidence that Warren cites as omitted by Georgia–Pacific primarily demonstrates her exposure to dust from tape joint compound in general. She otherwise cites the same testimony as Georgia–Pacific regarding the identification of the brands of tape joint compound used at the work sites where Warren was exposed to tape joint compound dust.

Warren helping clean up at the duplex project after the drywall work was finished, i.e., cleaning up tape joint compound dust. Further, while only one of these two witnesses recalled Georgia–Pacific tape joint compound being used in the construction of Warren's house, they both remembered Warren being at that work site often and doing a lot of the work herself, including cleaning up dust from the tape joint compound. Warren's brother and mother both testified that Warren regularly helped with the cleanup work at her father's projects.[17] Warren testified that each cleanup session took between three and four hours and that she did cleanup work an average of three times per week until she went to college, during which time she helped between two and three days per week. Warren's mother recalled Warren occasionally sanding tape joint compound at some of those work sites, and Warren testified that she sanded roughly 50% of the tape joint compound in her own home.

¶34    Construing this evidence, which amounts to only a snapshot of what was presented at trial, in a light most favorable to Warren, Warren has demonstrated that she did cleanup work that most often involved sweeping asbestos-containing dust from tape joint compound at her father's work sites, which 20% of the time used Georgia–Pacific tape joint compound, and that she did this for an average of nine to twelve hours per week for nineteen years in addition to the time she spent at her own home cleaning up tape joint compound dust and sanding 50% of the tape joint compound herself, some of which was also Georgia–Pacific's tape joint compound. In addition, at all relevant times, Georgia–Pacific's tape joint compound contained asbestos.

¶35    Next, we consider this evidence under the predominant view of the medical community, as simplified (immensely) by Georgia–Pacific at oral arguments, that a person does not develop asbestos-caused peritoneal mesothelioma without having frequent,

---

17. Warren helped at various construction sites from 1958 to 1977. Her brother testified that he started helping sometime around 1966 or 1969, when he was between five and eight years old.

regular, and proximate exposures to asbestos. Here, the evidence is sufficient to demonstrate just that. Whether Warren's evidence is to be believed over conflicting evidence that was also presented at trial is not relevant for our analysis where the standard requires a showing of no competent evidence. *See Nixdorf v. Hicken*, 612 P.2d 348, 354 n.16 (Utah 1980) ("While the defendant may introduce conflicting . . . testimony on the cause of the accident this should not be relied upon by the trial judge to remove the case from the jury's consideration. Rather, this establishes a conflict in the evidence which it is the jury's duty to resolve."). Accordingly, we affirm the trial court's denial of Georgia–Pacific's directed verdict motion. *See generally Mahmood*, 1999 UT 104, ¶ 16 (explaining that a directed verdict should be denied "if the evidence at trial raised a question of material fact" that "preclude[s] judgment as a matter of law").

CONCLUSION

¶36   The trial court was correct in determining that the LRA, rather than the CNA, applied in this case. We affirm the trial court's denials of Union Carbide's JNOV motion and Georgia–Pacific's directed verdict motion.[18]

———————

18. We deny Warren's request for costs on appeal because she did not prevail on the issue she appealed. *See generally* Utah R. App. P. 34(a).